Shari L. Klevens, *pro hac vice*
shari.klevens@dentons.com
Alanna Clair, *pro hac vice*
alanna.clair@dentons.com
DENTONS US LLP
1900 K Street NW
Washington, D.C. 20006
Tel: (202) 496-7500

Jonathan Gross, State Bar No. 122010
jgross@moundcotton.com
MOUND COTTON WOLLAN & GREENGRASS LLP
2200 Powell Street, Suite 1050
Emeryville, California 94608
Tel: (510) 900-9371

Joseph Grasso, *pro hac vice*
grasso@grassomoeller.com
GRASSO MOELLER LLC
46 Summit Street
Philadelphia, PA, 19118
Tel: (917) 744-4776

Attorneys for Plaintiffs/Counterclaim Defendants
ZURICH AMERICAN INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE COMPANY and
GREAT AMERICAN INSURANCE COMPANY

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY and GREAT AMERICAN INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>CHEVRON U.S.A. INC. d/b/a Chevron Products Company and CHEVRON CORPORATION,<br><br>Defendants. | Case No. 3:24-cv-02733-JSC<br><br>**PLAINTIFFS/COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Date**: July 14, 2026<br>**Time**: 10:00 am<br>**Ctrm**: Courtroom 8<br><br>**Judge**: Hon. Jacqueline Scott Corley<br>**Complaint Filed**: May 7, 2024 |
| CHEVRON U.S.A. INC. et al.,<br><br>Defendants/Counterclaim Plaintiffs,<br><br>v.<br><br>ROYAL AND SUN ALLIANCE INSURANCE LTD.; et al.,<br><br>Counterclaim Defendants. | |

# TABLE OF CONTENTS

I. NOTICE OF MOTION ........ 1
II. INTRODUCTION ........ 1
III. APPLICABLE LAW AND SUMMARY JUDGMENT STANDARD ........ 3
IV. UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT ........ 5
 A. Key Policy Terms ........ 5
  1. Marine Cargo Coverage ........ 6
  2. War Risks Form ........ 7
 B. The Negotiation of the Policy ........ 8
 C. The Seizure of the *Advantage Sweet*, Subsequent Confiscation of Chevron's Oil, and Primary Insurers' Investigation of the Claim ........ 10
  1. Seizure of *Advantage Sweet* ........ 10
  2. Primary Insurers' Investigation and Correspondence ........ 12
  3. Chevron's Oil is Confiscated by Court Order ........ 15
  4. Chevron Submits its Proof of Loss ........ 17
  5. Primary Insurers Deny Coverage ........ 19
V. LEGAL ARGUMENT ........ 19
 A. Chevron's "Loss" Was the Confiscation of its Oil ........ 19
 B. Chevron's Loss Is Not Covered Under the Marine Cargo Coverage ........ 20
  1. Coverage Under the Marine Cargo Form Is Excluded By the FC&S Warranty ........ 21
  2. There is No Coverage Under the LNG Endorsement ........ 23
 C. There is No Coverage Under the War Risks Form ........ 23
  1. The Policy's Requirement for War is Plain and Unambiguous – and Has Been Reinforced by Case Law for 100 Years ........ 24
   a. The War Risks Form Insures "Against War Risks Only" ........ 24
   b. Warlike Operations and Hostilities Require Ongoing War ........ 25





MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

c. Even Situations Involving Actual War Still Require Evidence that War Caused the Claimed Injury ....................28

d. The War Risks Form Requires a Declaration of War ....................28

2. There Were No "Warlike Operations" in Prosecution of "Hostilities" ....................29

a. The U.S. and Iran Were Not At War in April 2023 or March 2024 ....................29

b. The Confiscation of Chevron's Oil Occurred by Court Order ....................33

c. The Seizure of the Third-Party Vessel Was Not Warlike or in Prosecution of Hostilities ....................34

3. Chevron Self-Insured For Peacetime Seizures and Political Tensions ....................34

4. The War Risk Form's Frustration of Voyage Warranty Bars Coverage ....................35

D. Primary Insurers Did Not Act in Bad Faith in Denying Coverage for the Claim ....................36

1. There is a Reasonable Dispute Over Coverage ....................36

2. Primary Insurers Took Reasonable Steps to Investigate Coverage ....................37

VI. CONCLUSION ....................40


MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Miller*,
743 F. Supp. 723 (N.D. Cal. 1990) ........ 4

*Am. States Ins. Co. v. Sacramento Plating, Inc.*,
861 F. Supp. 964 (E.D. Cal. 1994), *aff'd*, 99 F.3d 1145 (9th Cir. 1996) ........ 24

*Aqua-Marine Constructors, Inc. v. Banks*,
110 F.3d 663 (9th Cir. 1997) ........ 5

*Ayala v. Infinity Ins. Co.*,
713 F. Supp. 2d 984 (C.D. Cal. 2010) ........ 39

*Batta v. Home Insurance Co. of New York*,
56 F. Supp. 967 (N.D. Cal. 1944) ........ 35, 36

*Blaine Richards & Co. v. Marine Indem. Ins. Co. of Am.*,
635 F.2d 1051 (2d Cir. 1980) ........ 20, 22

*Bohemia, Inc. v. Home Ins. Co.*,
725 F.2d 506 (9th Cir. 1984) ........ 4

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*,
971 F.2d 272 (9th Cir. 1992) ........ 36

*Butler v. Clarendon Am. Ins. Co.*,
494 F. Supp. 2d 1112 (N.D. Cal. 2007), *aff'd*, 317 F. App'x 648 (9th Cir. 2009) ........ 4

*Cardiner v. Provident Life & Acc. Ins. Co.*,
158 F. Supp. 2d 1088 (C.D. Cal. 2001) ........ 37

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 3

*Chamberlain v. Allstate Ins. Co.*,
931 F.2d 1361 (9th Cir. 1991) ........ 4

*Commodities Rsrv. Co. v. St. Paul Fire & Marine Ins. Co.*,
879 F.2d 640 (9th Cir. 1989) ........ 4, 21, 22

*Crist v. U.S. War Shipping Admin.*,
163 F.2d 145 (3d Cir. 1947) ........ 24

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

*Doe v. State Farm Gen. Ins. Co.*,
No. 23-CV-04734-JSC, 2024 WL 4476654 (N.D. Cal. Oct. 11, 2024) (Corley, J.) .......... 38

*Dole v. New England Mut. Marine Ins. Co.*,
88 Mass. 373 (1863) .......... 22

*Duncan v. State Farm Mut. Auto. Ins. Co.*,
494 F. Supp. 3d 742 (E.D. Cal. 2020) .......... 38

*Emerald Bay Cmty. Ass'n v. Golden Eagle Ins. Corp.*,
130 Cal. App. 4th 1078 .......... 39

*Esso Standard Oil Co. v. U.S.*,
122 F. Supp. 109 (S.D.N.Y. 1954), *aff'd*, 221 F.2d 805 (2d Cir. 1955) .......... 24, 25

*Evanston Ins. Co. v. Atain Spec. Ins. Co.*,
254 F. Supp. 3d 1150 (N.D. Cal. 2017) .......... 3, 4

*Fontaine v. Provident Mut. Lif. Ins. Co. of Philadelphia*,
10 F. App'x 415 (9th Cir. 2001) .......... 5

*Franceschi v. Am. Motorists Ins. Co.*,
852 F.2d 1217 (9th Cir. 1988) .......... 36

*Gerald Metals, LLC v. Certain Underwriters at Int'l Underwriting Ass'n of London*,
231 Conn. App. 514 (2025) .......... 22

*Great Lakes Ins. SE v. Raiders Retreat Realty Co.*,
601 U.S. 65 (2024) .......... 29

*Guebara v. Allstate Ins. Co.*,
237 F.3d 987 (9th Cir. 2001) .......... 5

*Intermondale Trading Co. v. N. River Ins Co. of N.Y.*,
100 F. Supp. 128 (S.D.N.Y. 1951) .......... 22

*Keenan v. Allan*,
91 F.3d 1275 (9th Cir. 1996) .......... 4

*Keshish v. Allstate Ins. Co.*,
959 F. Supp. 2d 1226 (C.D. Cal. 2013) .......... 36

*Kimta AS v. Royal Ins. Co.*,
102 Wash. App. 716 (2000) .......... *passim*

*Lunsford v. Am. Guar. & Liab. Ins. Co.*,
18 F.3d 653 (9th Cir. 1994) .......... 36

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

*Mason v. Mercury Cas. Co.*,
64 Cal. App. 3d 471 (1976) ........ 39

*Nordling v. Gibbon*,
62 F. Supp. 932 (S.D.N.Y. 1945) ........ 29

*Pac. Merch. Shipping Ass'n v. Aubry*,
918 F.2d 1409 (9th Cir. 1990) ........ 29

*Panama Transp. Co. v. U.S.*,
155 F. Supp. 699 (S.D.N.Y. 1957), *aff'd sub nom. U.S. as Owner of the Mobilgas v. Panama Transp. Co. & the Esso Balboa*, 253 F.2d 758 (2d Cir. 1958) ........ 25, 28

*Philadelphia Indem. Ins. Co. v. Gotham Mgmt., LLC*,
No. 16CV673 NLS (JMA), 2017 WL 11421367 (S.D. Cal. May 23, 2017) ........ 39

*Queen Ins. Co. of Am. v. Globe & Rutgers Fire Ins. Co.*,
282 F. 976 (2d Cir. 1922), *aff'd*, 263 U.S. 487 (1924) ........ *passim*

*Resin Coatings Corp. v. Fid. & Cas. Co. of N.Y.*,
489 F. Supp. 73 (S.D. Fla. 1980) ........ 22, 24, 33

*RFS Invs. Co., LLC v. Travelers Prop. Cas. Co. of Am.*,
No. LACV1709212JAK(ASX), 2019 WL 1976470 (C.D. Cal. Mar. 8, 2019) ........ 39

*Samuels v. United Seamen's Serv. Inc.*,
165 F.2d 409 (9th Cir. 1948) ........ 30

*Sekera v. Allstate Ins. Co.*,
763 F. App'x 629 (9th Cir. 2019) ........ 5

*Sony Comput. Entm't Am., Inc. v. Am. Home Assurance Co.*,
532 F.3d 1007 (9th Cir. 2008) ........ 36

*Standard Oil Co. of N.J. v. St. Paul Fire & Marine Ins. Co.*,
59 F. Supp. 470 (S.D.N.Y. 1945) ........ 29

*Tillery v. Hull & Co.*,
876 F.2d 1517 (11th Cir. 1989) ........ 20, 22

*U.S. v. Standard Oil Co. of N.J*,
178 F.2d 488 (2d Cir. 1949), *aff'd sub nom. Standard Oil of N.J. v. U.S.*, 340 U.S. 54 (1950) ........ 24, 25, 33, 34

*Wilburn Boat Co. v. Fireman's Fund Ins. Co.*,
348 U.S. 310 (1955) ........ 4

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

**Statutes**

50 U.S.C. § 1543(a)(1) .......... 27

50 U.S.C. § 1544(b) .......... 27

**Court Rules**

Fed. R. Civ. P. 56 .......... 1, 3

**Secondary Legal Sources**

43 Am. Jur. 2d Insurance § 613 .......... 25

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

## I. NOTICE OF MOTION

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on **July 14, 2026 at 10:00 am**, or on any other date provided by this Court, in Courtroom 8 of the above-entitled Court located at 450 Golden Gate Avenue, San Francisco CA 94102, Plaintiffs/Counterclaim Defendants ZURICH AMERICAN INSURANCE COMPANY ("Zurich"), LIBERTY MUTUAL INSURANCE COMPANY ("Liberty"), and GREAT AMERICAN INSURANCE COMPANY ("GAIC") (collectively, "Primary Insurers") hereby move for summary judgment on their claims and on the claims of Defendants/Counterclaim Plaintiffs CHEVRON U.S.A. INC. and CHEVRON CORPORATION (collectively, "Chevron").

Pursuant to Fed. R. Civ. P. 56, Primary Insurers seek summary judgment as a matter of law for their three causes of action and Chevron's counterclaims (Counts I-III).

## II. INTRODUCTION

This case involves an insurance coverage dispute concerning the Iranian government's seizure of an oil tanker and subsequent confiscation of Chevron's oil. Chevron seeks coverage under two parts of the Policy: (1) a Marine Cargo coverage that insures loss or damage to property, but excludes "seizure, arrest, restraint, detainment, [and] confiscation" (the "Free of Capture & Seizure Warranty" or "FC&S Warranty"); and (2) a War Risk coverage that insures "against War Risks only" and requires "warlike operations," ongoing "hostilities," and a "declaration of war." (Ex. 1 (Dep. Ex. D-3) -17198, -17225-26.)[1] Chevron's claimed insurance losses – caused by confiscation and geopolitical tensions, but not war – are not covered.

The facts in this case are undisputed. On April 27, 2023, the Iranian Navy boarded and seized the *Advantage Sweet*, a vessel owned by a third party carrying Chevron's crude oil through the Gulf of Oman. No weapons were fired, no property was damaged, and no one was hurt. The Iranian government seized the *Advantage Sweet* in retaliation for the U.S. Government's seizure a few days earlier of another vessel carrying Iranian oil (the *Suez Rajan*). (Ex. 2 (Dep. Ex. P-190) -08147-48.)

[1] Due to the length of characters in the Bates numbers, Primary Insurers will be citing to the last five digits of the relevant Bates number(s).

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

Iran kept the vessel at a port for nearly a year. Chevron argues that the seizure of the *Advantage Sweet* was inherently "hostile" and part of a secret, undeclared "shadow war" between the U.S. and Iran that has been waged continuously for 47 years. This position is contrary to public knowledge (the U.S. and Iran have not been in endless war for 47 years) and to the Policy language (which requires war and "hostilities," not mere "hostile" acts).

Chevron's position also ignores that Chevron's loss did not occur when the Iranian government seized the *Advantage Sweet*. It occurred eleven months after the seizure, when, as Chevron reports, Iranian government officials boarded the vessel, read aloud the contents of an Iranian court order "confiscating" the oil, and scheduled a "ship to ship" transfer through which Iran expropriated Chevron's oil. The master of the vessel was informed at that time in March 2024 that [redacted] (Ex. 3 (Dep. Ex. P-88) -04494 (emphasis added).) Chevron sustained its loss, formalized its claim for that loss to the insurers, and recorded the loss on its own books only after the Iranian government confiscated its oil. Thus, it is undisputed that Chevron's loss occurred at the time of the confiscation of the oil it owned, not the seizure of a vessel it did not own. This distinction is important under the language of the Policy because civil confiscation of oil is not a "warlike operation" nor a "war risk" that can only occur in times of war.

Chevron's argument that the Policy covers any type of seizure in the Gulf of Oman, even peacetime seizures, and acts that are merely hostile or aggressive is contrary to the plain and unambiguous Policy wording. There is no coverage under the Marine Cargo form because of the FC&S Warranty that excludes seizure and confiscation – a fact Marsh (Chevron's broker who prepared the Policy) repeatedly conveyed to Chevron. There is no coverage under the War Risk form because it does not insure government confiscation of cargo or the seizure of the vessel that preceded it, neither of which occurred in the context of the "prosecution of hostilities" as that term has been defined by U.S. maritime case law. The wording used by the War Risk form, which is a longstanding form in the industry promulgated by the American Institute of Marine Underwriters (AIMU), has been interpreted for more than a century to require "***an actual operation, either***

***offensive or defensive, in the conduct of war***" and "***operations in time of war***." *Queen Ins. Co. of Am. v. Globe & Rutgers Fire Ins. Co.*, 282 F. 976, 979 (2d Cir. 1922), *aff'd*, 263 U.S. 487 (1924) (emphasis added). The enforcement of an Iranian court order, in peacetime, at a scheduled time and under looming threat of "further legal proceedings" is not a "warlike operation" that triggers coverage under the War Risks form issued to Chevron. Chevron had the option to purchase separate political risk insurance that could apply to such confiscations by foreign governments, but calculated it was more cost-effective to remain self-insured for such an event. Chevron knew exactly what insurance it bought and what products it determined to forego.

Where there is no coverage, there can be no bad faith. But even if this Court finds there is a triable coverage issue, Chevron's claim for bad faith should be dismissed now because the record shows a genuine and reasonable dispute over coverage, which precludes a finding of bad faith. As part of their investigation, Primary Insurers carefully reviewed the facts and information provided by Chevron. They engaged an outside consultant to obtain additional information, retained outside counsel to assist in evaluating Chevron's claim, and undertook a thorough investigation before concluding there was no coverage. Chevron has not identified any facts missed by Primary Insurers or policy language omitted during that investigation. Chevron merely identifies its own disagreement with the coverage determination, which is not a basis for bad faith and should not survive to trial.

## III. APPLICABLE LAW AND SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of identifying the basis of its motion and the materials that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Evanston Ins. Co. v. Atain Spec. Ins. Co.*, 254 F. Supp. 3d 1150, 1155 (N.D. Cal. 2017) (quoting *Celotex Corp.*, 477 U.S. at 325). Once the moving party carries its initial burden, the non-moving party must

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

identify the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The interpretation of an insurance policy is generally a question of law for the court. *See Allstate Ins. Co. v. Miller*, 743 F. Supp. 723, 724 (N.D. Cal. 1990). The "clear and explicit meaning" of the provisions "interpreted in their ordinary and popular sense ... controls judicial interpretation unless [the disputed terms are] used by the parties in a technical sense, or unless a special meaning is given to them by usage." *Evanston*, 254 F. Supp. 3d at 1156 (quoting *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 666 (1995)). The insured has the burden of showing that a loss comes within the scope of coverage. *Chamberlain v. Allstate Ins. Co.*, 931 F.2d 1361, 1364 (9th Cir. 1991). The insurer bears the burden of proof on exclusions. *Butler v. Clarendon Am. Ins. Co.*, 494 F. Supp. 2d 1112, 1126 (N.D. Cal. 2007), *aff'd*, 317 F. App'x 648 (9th Cir. 2009).

Federal maritime law governs the policy interpretation questions in this case. *Kimta AS v. Royal Ins. Co.*, 102 Wash. App. 716, 721 (2000). For Courts reviewing marine insurance policies[2], state law controls "the interpretation of a marine insurance policy only in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice." *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 509-10 (9th Cir. 1984); *see also Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 314 (1955) (same). Here, there is substantial existing case law applying federal maritime law to these policy interpretation issues. *See, e.g.*, *Commodities Rsrv. Co. v. St. Paul Fire & Marine Ins. Co.*, 879 F.2d 640, 642 (9th Cir. 1989) (applying federal maritime law to FC&S Clause); *Queen*, 282 F. at 979 (libel in admiralty case reviewing requirement for "hostilities" and "warlike operations"); *Kimta AS*, 102 Wash. App. at 721 (applying federal maritime law to review of Free of Capture & Seizure Warranty and War Risks form). Moreover, in light of the requirement for uniformity in admiralty law and practice, the parties' claims dealing with the meaning and interpretation of Policy terms are subject to federal maritime case law.

For Chevron's bad faith claim, a federal court sitting in admiralty must apply federal maritime choice-of-law rules. *Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 670 (9th Cir. 1997).

[2] This Court has confirmed that it has federal admiralty jurisdiction over this maritime insurance case. (Doc. 209.)

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

The Ninth Circuit has held that the "most significant relationship" test should apply in maritime cases for issues of state law. *Id.* at 674 (quoting Restatement (Second) of Conflicts § 188(1) (1971)). The parties here do not dispute that California has the most significant relationship to this matter, including because Chevron's principal place of business is in California. In order to establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause. *Guebara v. Allstate Ins. Co*., 237 F.3d 987, 992 (9th Cir. 2001); *see also Sekera v. Allstate Ins. Co*., 763 F. App'x 629, 631 (9th Cir. 2019). The reasonableness of an insurer's denial is determined with reference to the information known or reasonably available to it at the time of denial. *Fontaine v. Provident Mut. Lif. Ins. Co. of Philadelphia*, 10 F. App'x 415, 418 (9th Cir. 2001).

## IV. UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT

### A. Key Policy Terms

Zurich, Liberty, and GAIC severally insure Chevron under the terms and conditions of Marine Cargo and War Risks Policy No. MMSF-23-5033, effective April 1, 2023 to April 1, 2024 (the "Policy"). (Ex. 1, -17148.) The Primary Insurers subscribe to Chevron's Policy on the following basis: Zurich (Lead Carrier) at 40%, Liberty (Follower) at 40%, and GAIC (Follower) at 20%. (*Id*. -17150.) Excess coverage was placed in the London market with insurers who agreed to the AIMU War Risk form, as described below.

The Policy is a manuscript policy, drafted by Marsh (as Chevron's broker), using both Marsh's own proprietary forms and historical forms widely-used in the industry. (Ex. 4 (Riemer Dep.) 358:22-359:21; Ex. 5 (Dep. Ex. P-164) -31196.) The Policy has two primary coverage parts: the Marine Cargo form and the War Risks form. (Ex. 1, -17148, -185, -224.) The Marine Cargo form is a standard Marsh manuscript form. (Ex. 6 (Dep. Ex. P-167); Ex. 4 (Riemer Dep.) 66:10-23.) It is an all-risk coverage with exclusions and warranties, including the FC&S Warranty (described below). (Ex. 6.) The War Risks form was promulgated by the AIMU. (Ex. 7 (Diverio Dep.) 55:2-6; Ex. 8 (Rizvi Dep.) 52:21-53:2, 68:6-14, 142:17-143:3; Ex. 4 (Riemer Dep.) 132:5-11; Ex. 1, -

17225.) It is a named-perils form (where the named peril is "war risks") that brings back some limited, but not all, coverage otherwise excluded by the FC&S Warranty in the Marine Cargo form. (Ex. 8 (Rizvi Dep.) 181:7-19; Ex. 4 (Riemer Dep.) 97:13-98:1, 98:10-99:16; Ex. 6 ("The war is always excluded on Cargo policies and then <u>some</u> perils are 'bought back'") (emphasis in original).)

The Declaration Page of the Policy sets forth Limits of Liability as "USD50,000,000 [for] any one vessel or connecting conveyance." (Ex. 1, -17148.) The Declaration Page provides that a surcharge rate of .10% will be applied "against shipments transiting West of 65 degrees and North of 15 degrees (Gulf of Oman, Arabian Gulf)." (*Id*. -17148.) The Policy also explains the parameters of the Lead/Follower relationship. Clause 75.1 provides that "[t]he subscribing insurers agree to follow the leading insurer" and Clause 75.2 provides that "[t]he subscribing insurers further agree to follow the leading insurer's agreements and/or settlements pertaining to claims, demands, and/or losses, including legal actions and/or proceedings, and in the settlement thereof." (*Id*. -17220.)

**1. <u>Marine Cargo Coverage</u>**

The Marine Cargo form insures all goods, merchandise and property "[a]gainst all risks of physical loss or damage from any external cause, except those risks as may be excluded by the warranties or exclusions specified in this policy." (*Id.* -17193.) The Marine Cargo form also provides coverage under Clause 28.2 (Deliberate Damage – Governmental Services), as amended by endorsement, which covers "physical loss of and/or damage to the goods and/or merchandise and/or property arising out of the performance of duties by customs service agents or other duly constituted governmental agencies," but that coverage is similarly "subject to all other insuring terms, conditions and warranties set forth elsewhere in this policy." (*Id.* -17152.) One such warranty or exclusion in the Marine Cargo form is the FC&S Warranty in Clause 17.1:

> This insurance is warranted free from loss, damage or expense caused by or resulting from:
>
> (i) capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise; ….
>
> (iii) all consequences of hostilities or warlike operations (whether there be a declaration of war or not)….





MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

(*Id*. -17198.) The FC&S Warranty is a "Paramount Warranty," which "shall be paramount and apply except to the extent they may be amended or replaced by superseding clause(s) or endorsement(s)." (*Id.*) Additional "all risks" and "war" coverage is provided through the "LNG Clauses (A)" and "War Clauses (LNG)" provisions in Endorsement No. 3 (the "LNG Endorsement"), but that coverage is limited to damage to or loss of Liquified Natural Gas ("LNG").[3] (*Id*., -17162, -166; Ex. 8 (Rizvi Dep.) 52:10-11, 76:13-77:20, 193:9-14; Ex. 6.)

**2. War Risks Form**

The two most common War Risks forms in the maritime insurance industry are the AIMU War Risk form and the London Institute War Clauses (also known as the "London Form" or the "Institute Standard Clauses"). There are significant differences between the two War Risk forms, particularly in scope. On behalf of Chevron, Marsh selected the AIMU War Risks form for this Policy.

The War Risks form in the Policy (i.e., the AIMU War Risks form) is titled "Policy of War Insurance" and insures "against War Risks only, in accordance with the terms and conditions hereinafter set forth." (Ex. 1, -17224, -17225.) Although the Marine Cargo form excludes coverage for seizures, confiscation, hostilities, and warlike operations, the War Risks form brings back some but not all of that coverage (as Marsh explained to Chevron). (Ex. 4 (Riemer Dep.) 97:13-98:1, 98:10-99:16; Ex. 6 (confirming that in light of the "standard" FC&S Warranty, only "certain perils" were "bought back" by the war risk coverage).) For example, the AIMU War Risks form does not bring back coverage for confiscation, but only covers seizures that occur in the context of "warlike operations" and "prosecution of hostilities," and requires a declaration of war:

> This insurance is only against the risks of capture, ***seizure***, destruction or damage by men-of-war, piracy, takings at sea, arrests, restraints, detainments and ***other warlike operations*** and acts of kings, princes and peoples ***in prosecution of hostilities*** or in the application of sanctions under international agreements, ***whether before or after declaration of war*** and whether by a belligerent or otherwise, including factions engaged in civil war, revolution, rebellion or insurrection, or civil strife arising therefrom; the imposition of martial law, military or usurped power, and including the risks of aerial bombardment, floating or stationary mines and

[3] By contrast, the *Advantage Sweet* was carrying Chevron's crude oil, not LNG.

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

> stray or derelict torpedoes. Warranted not to abandon (on any ground other than physical damage to ship or cargo) until after condemnation of the property insured.

(Ex. 1, -17225-26 (emphasis added).)

Clause 2 of the War Risks form also provides that the insurance is "[w]arranted free from any claim based upon loss of, or frustration of, the insured voyage or adventure caused by arrests, restraints or detainments." (*Id*. -17226.)

**B. <u>The Negotiation of the Policy</u>**

Third-party Marsh has been Chevron's commercial insurance broker for decades and presented the Policy at issue. (Ex. 7 (Diverio Dep.) 50:24-51:2; Ex. 4 (Riemer Dep.) 358:22-359:21.) In 2016, before any of the Primary Insurers subscribed to Chevron's risk, Marsh elected to use the London Form for that policy year. (Ex. 7 (Diverio Dep.) 53:5-16; Ex. 9 (Appendix).) The coverage provided by the London war risks form is broader than the AIMU form; in short, the London form provides coverage for "loss of or damage to" property from "seizure" arising from "any hostile act":

> 1. This insurance covers, except as excluded by the provisions of Clauses 3 and 4 below, ***loss of or damage to the subject-matter insured caused by***
>
> 1.1 war civil war revolution rebellion insurrection, or civil strife arising therefrom, or ***any hostile act*** by or against a belligerent power
>
> 1.2 capture ***seizure*** arrest restraint or detainment, ***arising from risks covered under 1.1 above, and the consequences thereof*** or any attempt thereat
>
> 1.3 derelict mines torpedoes bombs or other derelict weapons of war.

(Ex. 10 (Dep. Ex. P-191) p. 5 (emphasis added).) Marsh and Chevron subsequently changed to the AIMU War Risks form for the 2017-2018 policy period and continued to use the AIMU War Risks form through the 2023-2024 Policy. (Ex. 9; Ex. 5, -31196; Ex. 4 (Riemer Dep.) 65:16-66:6.) Notably, the Excess Insurers testified that when they joined the Chevron cargo insurance program, it was critical to them to confirm that the coverage to which they were bound was "no wider" in scope than the AIMU War Risk form. That is because the coverage under the AIMU War Risk form was narrower and more restrictive than under the London Form, such that the Excess Insurers would

not agree to be bound if any Primary Insurers instead agreed to the broader London Form. (Ex. 11 (Fiddimore Dep.) 22:25-23:15; Ex. 12 (Blackman Dep.) 89:1-6; Ex. 13 (O'Brien Dep.) 146:15-147:18.)

Marsh and Chevron also explored whether Chevron should supplement the scope of coverage in its portfolio by purchasing a type of insurance known as "political risk insurance," [redacted] (Ex. 14 (Dep. Ex. P-163) -01919.) As Chevron's Director of Risk Management testified, political risk insurance typically covers "confiscation [and] expropriation-type political risks." (Ex. 15 (Wondolleck Dep.) 54:1-5.) However, Chevron decided it was not cost-effective, instead opting to "self-insure" because it is "generally uneconomic for a company of Chevron's size to maintain political risk insurance." (*Id*. (Wondolleck Dep.) 54:5-11; Ex. 4 (Riemer Dep.) 59:1-60:11.) Indeed, in light of Chevron's "strong balance sheet," it found it could "absorb… pretty large losses." (Ex. 4 (Riemer Dep.) 59:1-19.)

In 2019, during the first year Zurich was lead insurer for the policy and the first year Liberty was a following insurer (Ex. 9 (Appendix)), Iran damaged several commercial vessels with limpet mines (none that involved Chevron). Ex. 16 (Dep. Ex. D-173) 18-19, 32; Ex. 17 (Dep. Ex. P-291) ¶¶ 19-22; Ex. 8 (Rizvi Dep.) 29:8-19; Ex.18 (Thompson Dep. Vol. 1) 102:17-103:4.) As a result, Zurich reached out to Marsh to "better understand Chevron's risk at hand and proactive engagement to reduce risk of loss in the region" and to collect data for purpose of pricing the risk. (Ex. 19 (Dep. Ex. D-16) -14067; Ex. 20 (Dep. Ex. P-168) -14022; *see also* Ex. 21 (Kazanjian Dep.) 109:16-20; Ex. 4 (Riemer Dep.) 102:11-103:6; Ex. 22 (Fowler Dep.) 82:9-83:7, 89:2-25.) Zurich issued a June 28, 2019 notice of cancellation for Chevron's War Risks coverage due to "[i]ncreased hazards in the Persian Gulf area." (Ex. 23 (Dep. Ex. D-19); *see also* Ex. 24 (Dep. Ex. D-18) -04514; Ex. 4 (Riemer Dep.) 110:24-111:10.) However, the cancellation also automatically reinstated Chevron's War Risks coverage, with an added surcharge only for shipments transiting the Gulf of Oman and Arabian Gulf. (Ex. 23.) Zurich's underwriter testified that this cancellation, reinstatement, and surcharge reflected the increased risk that a war could "break out" in the region. (Ex. 21 (Kazanjian Dep.) 291:4-11, 120:25-121:13, 132:3-22.) Chevron understood this was a market-wide development among war

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

risk insurers at the time. (Ex. 15 (Wondolleck Dep.) 57:18-58:1.) The 2019 cancellation and reinstatement made it clear that "ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED." (Ex. 23.) Both Chevron and Marsh confirmed in depositions that the surcharge did not change the scope of coverage of the War Risks form. (Ex. 7 (Diverio Dep.) 77:12-20; Ex. 4 (Riemer Dep.) 372:5-373:8.) [redacted] (*See, e.g.*, Ex. 21 (Kazanjian Dep.) 150:5-10, 178:8-15.)

### C. The Seizure of the *Advantage Sweet*, Subsequent Confiscation of Chevron's Oil, and Primary Insurers' Investigation of the Claim

#### 1. Seizure of *Advantage Sweet*

Chevron chartered the *Advantage Sweet*, a crude oil tanker owned by a Chinese company and operated by a Turkish company, "to transport crude from the Neutral Zone shared by Saudi Arabia and Kuwait to Houston, Texas." (Ex. 2, -8144; Ex. 10, p. 6; Ex. 25 (P-96) -21980.) As part of Chevron's security protocols, Chevron vetted and approved the *Advantage Sweet* for its voyage through the Gulf of Oman. (Ex. 26 (Davis Dep.) 27:19-23.) Per Chevron's policies, the *Advantage Sweet* voyage did not get escalated for approval by the company's Chief Security Officer, which was required when a vessel is transiting through a "war zone," an area of civil unrest, or a piracy high-risk area. (*Id.* 107:1-108:11.) [redacted] (Ex. 27 (Dep. Ex. P-200).)

On or about April 27, 2023, members of the Iranian Navy boarded and seized the *Advantage Sweet*. (Ex. 2, -8144; Ex. 28 (Dep. Ex. P-93) -01388.) The boarding occurred via helicopter: members of the Iranian Navy rappelled down to the vessel and commanded the vessel to go to an Iranian port, where the Iranian government detained the vessel, cargo, and crew. (*Id.*) When the Iranian Navy seized the vessel, there were no injuries or deaths, no damage to the vessel, and no weapons fired. (Ex. 29 (Pickering Dep.) 223:12-224:13.) [redacted]



MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

[redacted] (Ex. 30 (Ross Dep.) 165:16-23; Ex. 31 (Coldrick Dep.) 89:5-8, 109:25-110:3, 120:17-20, 171:5-11; Ex. 18 (Thompson Dep. Vol. 1) 172:13-173:4; Ex. 32 (Dep. Ex. P-70) -02118, -02119; Ex. 33 (Dep. Ex. P-103) -26396.)

In the weeks after the seizure, both Chevron and Primary Insurers attempted to gather information relating to the incident. Eventually all parties reached the same conclusion about what had happened. According to Chevron's Proof of Loss and reports to Chevron from the vessel operator, the seizure of the *Advantage Sweet* was ordered by an Iranian court as a "tit for tat" by Iran in retaliation for the U.S. seizure of the *Suez Rajan*, a vessel that violated U.S. sanctions. (Ex. 34, -5755; Ex. 2, -8149-50, 52, 54.) This was also confirmed by the Primary Insurers' independent investigation and Chevron's testimony in this case; there is no dispute as to why the *Advantage Sweet* was seized. (Ex. 35 (Dep. Ex. D-35) C'Claim ¶¶ 32, 34; Ex. 2, -08147-50; Ex. 25, -21980; Ex. 36 (Dep. Ex. P-65) -14970; Ex. 37 (Dep. Ex. P-68) -14965; Ex. 38 (Dep. Ex. P-114) -21448; Ex. 18 (Thompson Dep. Vol. 1) 108:9-23, 134:5-135:4, 155:13-20, 261:11-23; Ex. 39 (Bancroft Dep.) 31:2-14, 60:14-61:10, 65:10-67:3, 75:23-76:16.) Chevron's Proof of Loss further confirmed the involvement of Iran's judiciary in the seizure of the vessel and the confiscation of oil: "To retaliate against the United States government for imposing and executing sanctions on its oil exports, Iran set its military and judiciary to the task of confiscating Chevron's crude oil while it was in international waters." (Ex. 2, -08158.)

The United States Navy never engaged in operations to recover the *Advantage Sweet* or its crew or to launch a military action against Iran in response to the seizure. (Ex. 31 (Coldrick Dep.) 65:13-66:13; Ex. 30 (Ross Dep. 71:20-72:16; Ex. 18 (Thompson Dep. Vol. 1) 96:24-97:2, 98:11-21; Ex. 40 (Thompson Dep. Vol. 2) 108:25-109:5; Ex. 29 (Pickering Dep.) 237:20-238:6.) The Fifth Fleet of the U.S. Navy, which operated out of Bahrain, issued a statement on the date of the seizure, calling on Iran to release the vessel, but did not otherwise engage: "Iran's actions are contrary to international law and disruptive to regional security and stability. The Iranian government should

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

immediately release the oil tanker." (Ex. 41 (Dep. Ex. P-61) -21314.) Chevron was also informed by U.S. military officials within days of the seizure that [redacted] (Ex. 105, -14968.) When the *Advantage Sweet* was seized, no war existed between the United States and Iran, nor was there a declaration of war by either country in response. (Ex. 42 (Mogartoff Dep.) 100:2-12; Ex. 29 (Pickering Dep.) 69:2-7.) Moreover, the U.S. Government did not take any action – military, diplomatic, or other – in response to the confiscation of Chevron's oil in 2024.

**2. Primary Insurers' Investigation and Correspondence**

On April 28, 2023, Marsh informed Zurich of a "potential claim submission from Chevron" following the Iranian "seizure" of the vessel. (Ex. 43 (Dep. Ex. D-6) -04840; Ex. 44 (Dep. Ex. D-73).) Zurich acknowledged the potential claim and asked Marsh to keep Zurich's claims team and the following insurers updated. (Ex. 43, -04839.) Both Chevron and Marsh understood that Zurich, as lead carrier, would primarily handle the potential claim, investigation, and correspondence on behalf of the Primary Insurers. (Ex. 4 (Riemer Dep.) 187:3-22; Ex. 45 (Dep. Ex. P-234) -20980; Ex. 8 (Rizvi Dep.) 117:21-118:9, 119:4-20; Ex. 7 (Diverio Dep.) 69:16-25.)

Initially, limited information was available. (Ex. 43, -04840; Ex. 46 (Dep. Ex. P-178) -11549.) After Marsh representatives reported to Chevron that coverage would be "fact dependent" but "may be provided under the war policy section 1(a)," Chevron's risk manager Kurt Riemer reported internally on May 1, 2023 that coverage was uncertain: [redacted] (Ex. 47 (P-172); Ex 48 (P-176) -11508.) An internal Marsh email also expressed caution about coverage under the War Risk form: [redacted] (Ex. 49 (Dep. Ex. P-175) -12336; *see also* Ex. 50 (Dep. Ex.

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

P-223) -18507 (Ali Rizvi of Marsh telling other Marsh employees on May 2 to "be on [the] cautious side of coverage opinion if any").) Marsh itself looked internally to find professionals who had experience with similar war risk claims, but given that such claims were "rare" and "unusual," Marsh's efforts were unsuccessful. (Ex. 51 (Kolbet Dep.) 28:16-19, 74:16-75:13.)

Separate from the war risks cover, Marsh conveyed to Chevron its position that there was no coverage for the seizure under the Marine Cargo form. (*Id.* 70:7-11 ("We did not believe the cargo policy, as separate from the war policy, we did not believe that the cargo policy had coverage for this incident."), 76:8-23, 111:16-112:8, 116:2-21 ("in discussions with Chevron, we advised them we did not believe there would be coverage underneath the cargo policy").) [redacted] (Ex. 52 (Dep. Ex. P-237) -20609; Ex. 6; Ex. 8 (Rizvi Dep.) 192:10-193:14; Ex. 51 (Kolbet Dep.) 80:4-16, 81:8-24.)

On May 15, 2023, Zurich sent an email to Marsh: (1) reserving rights; (2) relaying the current understanding of the *Advantage Sweet* incident; (3) noting that the incident was still under investigation; and (4) requesting twelve categories of documents to assist in the investigation. (Ex. 53 (Dep. Ex. D-123).) As part of their investigation, Primary Insurers retained two outside law firms to assist. Zurich retained the London office of the international law firm Kennedys on behalf of the Primary Insurers to lead a factual investigation and gather facts from London-based industry insiders. (Ex. 54 (Dep. Ex. D-124); Ex. 55 (Perfect Dep.) 245:6-247:3; Ex. 56 (Eugenio Dep.) 127:20-128:25; Ex. 57 (Zrebiec Dep.) 62:10-18; Ex. 58 (Frick Dep.) 148:6-150:23.) Kennedys provided Zurich with several updates that were shared with and considered by Liberty and GAIC. (Ex. 59 (Dep. Ex. D-10); Ex. 57 (Zrebiec Dep.) 147:7-150:25; Ex. 60 (Penberthy Dep.) 238:9-22.) The Primary Insurers also retained the law firm of Nicoletti Hornig & Sweeney, an experienced marine cargo coverage firm, as coverage counsel. (Ex. 55 (Perfect Dep.) 111:4-13.)

Following the seizure, the employee at Chevron who was charged with reviewing the status of the *Advantage Sweet*'s crew and their welfare confirmed that, from a humanitarian perspective, there were no concerns as to the "wellbeing" or the "safety" of the crew: they were treated well, were

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

healthy, and could speak with their families, such that "[l]ife on board is close to routine." (Ex. 61 (Dep. Ex. P-92) -06157-61, 06167-68; Ex. 39 (Bancroft Dep.) 88:19-89:1, 94:21-95:23; Ex. 62 (Adamson Dep.) 37:13-22, 39:5-8, 70:2-74:21.) Chevron was never informed of any contrary information regarding the crew's wellbeing. (Ex. 62 (Adamson Dep.) 70:9-15.) There were multiple crew changes. (*Id.* 72:16-24, 157:7-14, 172:22-173:8; Ex. 63 (Dep. Ex. P-122).) Notably, the crew were separately insured by a Protection & Indemnity Club (P&I Club). (Ex. 64, -03683.) The P&I Club denied claims for extra compensation for the crew on the grounds that the *Advantage Sweet* was not seized in a "warlike operations area" or a "high risk zone," as required for coverage. (*Id.*)

Chevron also had several contacts at the U.S. Government with whom it discussed the seizure. (Ex. 65 (Dep. Ex. P-209).) [redacted] (*Id.*; Ex. 40 (Thompson Dep. Vol. 2) 69:8-17, 99:7-14; Ex 66 (Sweeney Dep.) 85:1-19; Ex. 67 (1/30/26 Chevron USA Rog Responses) p. 3.) [redacted] (Ex. 68 (Dep. Ex. P-35); Ex. 69 (Dep. Ex. P-36.)

On June 21, 2023, Zurich, as lead insurer, sent Chevron correspondence addressing the "potential claim."[4] (Ex. 70 (Dep. Ex. D-37) -01208.) At that time, Zurich noted that there "appears to Zurich to be a lack of coverage under the Marine Policy and the War Risks Policy for any claim arising from the incident." *Id.* Prior to the issuance of the June 21, 2023 Letter, both Liberty and GAIC discussed with Zurich the coverage positions that would be taken. (Ex. 57 (Zrebiec Dep.) 179:13-25; Ex. 60 (Penberthy Dep.) 226:23-227:10.) Neither Liberty nor GAIC ever disagreed with any of the positions stated in the June 21, 2023 Letter or any subsequent coverage positions taken by Zurich on behalf of Primary Insurers. (Ex. 57 (Zrebiec Dep.) 42:22-25, 179:13-25, 218:2-14; Ex. 58

[4] Primary Insurers characterize this letter as a Reservation of Rights, given that the claim and loss were still only "potential" and the parties continued to meet and discuss coverage and investigate facts after this letter. Chevron characterizes this letter as a denial. However, this is a distinction without a difference. The parties agree as to the content of the letter and that the parties continued to meet and discuss case law and facts impacting coverage after the letter was sent and before Chevron submitted its Proof of Loss in April 2024.

(Frick Dep.) 136:21-22; Ex. 60 (Penberthy Dep.) 233:6-8.)

Zurich also had discussions with Marsh, as Chevron's representative, before the June 21, 2023 Letter was sent, in order to preview the insurers' coverage position. (Ex. 51 (Kolbet Dep.) 97:13-98:25.) Zurich informed Marsh in June 2023 that a declaration of war was required for coverage. (*Id.* 96:4-16.) At the time of the June 21, 2023 Letter, there had been no actual loss of cargo. (*Id.* 100:9-13.) Contrary to the view it took when discussing the matter internally, Marsh's view presented to Zurich at that time was that "if the cargo eventually was taken from the occurrence of the seizure, then there would clearly be coverage underneath the war policy." (*Id.* 99:22-100:1.)

Following the June 21, 2023 Letter, Chevron, Marsh, and Zurich also engaged in discussions, had a face-to-face meeting, and exchanged several letters regarding their positions. (*See, e.g.*, Ex. 71 (Dep. Ex. D-128); Ex. 72; Ex. 73 (Dep. Ex. D-30).) Indeed, in November of 2023, Zurich organized a face-to-face meeting between Zurich, Chevron, and Marsh, where the status of Chevron's potential claim and the coverage positions were discussed with protections of confidentiality and without the presence of outside lawyers. (Ex. 71 (Dep. Ex. D-128) -02367-69; Ex. 110 (Dep. Ex. P-227) -12439.) GAIC and Liberty were subsequently informed of the substance of these discussions and signed onto the parties' agreement of confidentiality. (Ex. 71, -02367.)

**3. <u>Chevron's Oil is Confiscated by Court Order</u>**

In July 2023, Chevron prepared an internal "Significant and Unique Items" ("SUI") report summarizing the company's response to the seizure of the *Advantage Sweet*. [redacted]





MOUND COTTON WOLLAN & GREENGRASS LLP
2200 Powell Street, Suite 1050
Emeryville, California 94608
Telephone: (510) 900-9371 Facsimile: (510) 900-9381

[redacted]

In March 2024, the Iranian government confiscated Chevron's crude oil from the *Advantage Sweet* by removing it through a scheduled ship-to-ship ("STS") transfer. [redacted] (Ex. 78 (Dep. Ex. P-85); Ex. 79 (Dep. Ex. P-84); Ex. 61, -06156.)[5] [redacted] (Ex. 83 (Dep. Ex. P-113 -05713).)

[redacted] (Ex. 84 (Dep. Ex. P-187).) [redacted]

[redacted]

[5] Primary Insurers also learned of the impending ship-to-ship transfer via Kennedys' investigation. (Ex. 80, -01697-98.) [redacted] (Ex. 81 (Dep. Ex. P-236) -12956; Ex. 82 (Dep. Ex. P-188).)





MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

(Ex. 3, -04494 (emphasis added).)[6] [redacted] (Ex. 18 (Thompson Dep. Vol. 1) 256:10-14.)

Chevron echoed this description of events in its binding Proof of Loss:

> On or around March 6, 2024, after the Advantage Sweet had remained under Iranian control for about a year, three representatives of the Iranian port authorities, accompanied by an agent, arrived on the Advantage Sweet with an Iranian court order addressed to the Iranian military and port authorities. The order was the result of a purported Iranian judicial proceeding to which neither Chevron nor the owner of the Advantage Sweet were parties or had any involvement. Chevron had no notice of or opportunity to respond to the judicial proceeding, to contest the issuance of this order, or to appeal its entry. The order, which was written in Farsi, was translated and read to the Master of the Advantage Sweet, Aleksandr Shtkykov, on March 6, 2024. ***The order stated that the representatives were obligated to ensure the immediate discharge and loading of the cargo from Advantage Sweet to another ship controlled by Iran 'as compensation from the previously confiscated … cargo from Suez Rajan' by the United States. Shortly thereafter, Iranian authorities unloaded and confiscated the Advantage Sweet's cargo: $51,876,881.68 worth of crude oil.***

(Ex. 2, -8149-50 (emphasis added) (internal citations omitted).) Chevron repeatedly called this event a "confiscation" and "expropriation" in its Proof of Loss (and a "confiscation" in its Counterclaim) because that is exactly what it was. (*Id.*, -8144, 8149, 8150, 8153, 8154, 8157, 8158; Ex. 35 C'Claim ¶¶ 5, 33, 34, 35, p. 23 heading B ("Iran's Seizure and Confiscation of Chevron's Crude Oil on the ADVANTAGE SWEET").)

[redacted] (Ex. 86 (Dep. Ex. P-185) -21870.) Iran released the vessel four months later. (Ex. 29 (Pickering Dep.) 306:2-7, 308:5-9; Ex. 63.)

**4. <u>Chevron Submits its Proof of Loss</u>**

Prior to March 2024, Chevron intentionally refrained from filing a formal claim or writing

---

6 [redacted] (Ex. 85 (Dep. Ex. P-240) -19842.)

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

off the cargo onboard the *Advantage Sweet* as a loss because it remained hopeful that its cargo would be returned. (Ex. 87 (Dep. Ex. P-183) -32495; Ex. 88 (Dep. Ex. P-11); Ex. 109 (Dep. Ex. P-14); Ex. 77 (Dep. Ex. P-180) -12709; Ex. 89 (Dep. Ex. P-288) -01126; Ex. 4 (Riemer Dep.) 166:16-167:4, 170:11-171:8, 189:18-191:12, 208:23-209:5, 213:7-13.) [redacted] (Ex. 18 (Thompson Dep. Vol. 1) 55:17-22.)

[redacted] (Ex. 90 (Dep. Ex. P-120); *see also* Ex. 91 (Dep. Ex. P-184) -20200.0001).) [redacted] (Ex. 92 (SUI Report) -32721; Ex. 93 (Rojas Dep.) 38:1-40:9, 44:11-22, 92:24-93:13 ([redacted]), 122:2-16.) [redacted] (Ex. 93 (Rojas Dep.) 119:23-120:6.)

Chevron then formalized its insurance claim via its April 5, 2024 Proof of Loss. Chevron has admitted that it was obligated to be truthful in its Proof of Loss. (Ex. 4 (Riemer Dep.) 147:20-148:1, 151:25-152:14, 152:25-153:7, 239:16-19.) The Proof of Loss is among the best evidence of the facts relating to the seizure of the *Advantage Sweet* and the subsequent confiscation of the cargo. Chevron described its Claim:

> Chevron's covered losses arise out of the seizure of the Advantage Sweet vessel and her cargo in April 2023 by the Iranian military and the subsequent unloading and expropriation from the vessel of approximately $51 million of Chevron's crude (the "Claim")…. ***After the Iranian military navigated the Advantage Sweet to an Iranian port and retained control of the vessel for almost a year, Iran confiscated Chevron's crude cargo under color of an Iranian court order***. As a result of the Iranian military's actions and the Iranian judiciary's unjustified order, Chevron suffered a loss of at least $51,876,881.68.

(Ex. 2, -08144 (emphasis added); *see also id.* at 08150 (the Mizan news agency "affiliated with Iran's judiciary reported on March 6, 2024 that a Tehran court had ordered the confiscation of the crude…").) Marsh reviewed the Proof of Loss prior to its submission and believed the information contained therein to be accurate. (Ex. 51 (Kolbet Dep.) 153:22-154:20, 157:8-12.) Although Marsh

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

had told Chevron that the LNG Endorsement was not applicable, Chevron continued to demand coverage under that Endorsement in its Proof of Loss. (*Id.* 116:2-21, 153:22-154:20.)

### 5. <u>Primary Insurers Deny Coverage</u>

On May 7, 2024, Zurich denied coverage for Chevron's claim on behalf of itself and the following Primary Insurers. (Ex. 94, -006382.) The Primary Insurers then filed this lawsuit for declaratory judgment in the U.S. District Court for the Northern District of California.

## V. <u>LEGAL ARGUMENT</u>

### A. <u>Chevron's "Loss" Was the Confiscation of its Oil</u>

The threshold question is ***when*** did Chevron's loss occur. Chevron focuses on the fact that the Iranian Navy wore masks and carried weapons (that were not fired) when they boarded the *Advantage Sweet* by helicopter on April 27, 2023 to argue that it was a "warlike operation" and part of an ongoing "shadow war" between the U.S. and Iran. However, Chevron's characterization is largely irrelevant because the vessel seizure is not Chevron's loss. Rather, Chevron's loss occurred when the Iranian government confiscated its oil in March 2024, following the vessel master's report of a court order and an Iranian threat of further "legal proceedings" if the vessel master did not comply. **Chevron did not own or even operate the vessel; Chevron only owned the oil on board, which was lost when Iran confiscated it in 2024**. This distinction as to Chevron's loss is critical because the Marine Cargo form excludes "confiscation" and the War Risk form does not bring that coverage back.[7] In addition, although the "seizure" of the vessel was not a "warlike operation" (but part of ongoing political tensions and a "tit for tat" retaliation for the U.S. seizing Iranian oil aboard the *Suez Rajan*), the confiscation of Chevron's oil was even more certainly not a "warlike operation" (nor part of ongoing "hostilities") because it occurred at an appointed time under color of a court order, as addressed below.

Federal courts reviewing marine insurance have "strictly" applied the doctrine of "*causa proxima non remota spectator*," meaning "the immediate, not the remote cause, is considered."

[7] This can be contrasted to a "seizure," which is similarly excluded in the Marine Cargo coverage, but brought back in the War Risks form (as long as it is part of "warlike operations" conducted "in prosecution of hostilities").

*Blaine Richards & Co. v. Marine Indem. Ins. Co. of Am.*, 635 F.2d 1051, 1054 (2d Cir. 1980); *Tillery v. Hull & Co.*, 876 F.2d 1517, 1519 (11th Cir. 1989). Courts "are not to take broad views but generally are to stop [their] inquiries with the cause nearest to the loss." *Queen*, 263 U.S. at 492. This includes consideration of the "real efficient" cause of the loss, based on "common sense and reasonable judgment as to the source of the losses alleged." *Blaine Richards*, 635 F.2d at 1054-55. For example, in *Blaine Richards*, the insured shipper alleged that it lost a shipment of beans when the United States detained the beans at customs due to fumigation of the beans that had occurred abroad (and was banned in the U.S.). The insurer argued that the detention of the beans was excluded by an FC&S Warranty, while the insured argued that the proximate cause of the loss was not the detention, but the underlying fumigation of the beans (which would be covered). The Court rejected the insured's argument, noting that the "strict" application of proximate cause did not require "but for" causation, but "upon the common sense understanding that the temporary physical loss of the beans was caused by detention." *Id*. Thus, there was no coverage.

So too here "common sense and reasonable judgment as to the source of the losses alleged" confirms that it was the confiscation of Chevron's oil in March 2024, and not the seizure of another party's vessel in April 2023, that is the immediate cause of Chevron's loss. Chevron's claim was "potential" and that Chevron continued to claim "legal title" to the oil until the STS transfer. [redacted] (Ex. 92, -32721; Ex. 93 (Rojas Dep.) 38:1-40:9, 44:11-22, 92:24-93:13 (triggering event was "the oil taken away from the ship").) [redacted][8] (*See* Ex. 96, -32742 ("Chevron wrote-off the Advantage Sweet for $52MM in 1Q24. Once this loss was recorded, Chevron filed a Proof of Loss with the Insurance companies.").)

**B. <u>Chevron's Loss Is Not Covered Under the Marine Cargo Coverage</u>**

This Court should conclude there is no coverage for Chevron's claim under the Marine Cargo

---

[8] [redacted] (Ex. 86, -21870; *see also* Ex. 95 (Dep. Ex. P-186) -22232.)



MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

form. As summarized above, Marsh advised Chevron – repeatedly – that there was no coverage for Chevron's claim under the Marine Cargo part of the Policy.[9] In this instance, Marsh is correct.

### 1. Coverage Under the Marine Cargo Form Is Excluded By the FC&S Warranty

When providing notice of its potential claim, Chevron described the at-issue event involving the vessel as a "seizure." Subsequently, in its Proof of Loss and its Counterclaim, Chevron repeatedly referenced the "confiscation" or "expropriation" of its oil by Iran in March 2024.[10] Coverage for losses resulting from these acts is precluded by the FC&S Warranty, irrespective of whether it was during a time of peace or war.

Clause 10.1 and Clause 28.2 of the Marine Cargo Form provide coverage subject to the warranties set forth in the Policy. One such Warranty is the FC&S Warranty, which precludes coverage for any "loss, damage or expense caused by or resulting from capture, ***seizure***, arrest, restraint, detainment, [or] ***confiscation***,… and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise."[11] (Ex. 1, -17198 (emphasis added).) The FC&S Warranty is "paramount" and dictates the coverage outcome under the Marine Cargo form. *See Commodities Rsrv.*, 879 F.2d at 645-46 (refusing to address argument that policy provisions conflicted with FC&S Clause because "the Free of Capture & Seizure Clause is listed as a Paramount Warranty"); *see also Kimta AS*, 102 Wash. App. at 725 ("The clause is not to be superseded by any other provision of the policy unless that provision expressly assumes the risks of capture and seizure. It is difficult to imagine how the policy could more clearly state that loss due to seizure is not covered under any circumstances.").

The FC&S Warranty is a staple of the standard marine cargo insurance policy dating back to

---

[9] The Marine Cargo form is Marsh's manuscript form: as the drafters, Marsh's conclusion that it doesn't apply to these facts is due some weight. This can be contrasted to the AIMU War Risks form, which is ***not*** a Marsh proprietary form and regarding which Marsh's opinion lacks relevance.

[10] [redacted] (Ex. 3.)

[11] The FC&S Warranty also excludes coverage for "all consequences of hostilities or warlike operations (whether there be a declaration of war or not)." This excluded coverage is only written back – in part – in the War Risks form.



MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

the Napoleonic era. *Id*. at 723. "[W]hen the insured warrants that the ship or goods in question shall be free from capture or seizure, the effect is that the insured is excluding coverage in the event either takes place." *Resin Coatings Corp. v. Fid. & Cas. Co. of N.Y.*, 489 F. Supp. 73, 74 (S.D. Fla. 1980) (citation omitted). Thus, a claim that an insured experienced loss as a result of a capture, seizure, or confiscation is not covered. In one recent decision, the Appellate Court of Connecticut reviewed a claim under a marine cargo policy relating to the alleged detention by Chinese customs agents (pursuant to Chinese court orders) of product purchased by the insured. *Gerald Metals, LLC v. Certain Underwriters at Int'l Underwriting Ass'n of London*, 231 Conn. App. 514, 553 (2025). The Court concluded that the FC&S Warranty applied to "clearly and unambiguously exclude[] coverage for losses arising from government seizure or detention." *Id.* at 551. The Court further noted that "courts in other jurisdictions have applied similar policy exclusions when an insured's loss is attributable to seizure or detention by civil authorities." *Id*. at 553.

This is a straight-forward conclusion that has been adopted by numerous courts. *Kimta AS*, 102 Wash App at 725; *Commodities Rsrv.*, 879 F.2d at 645 (FC&S Warranty applied where vessel carrying cargo was seized by Greek authorities); *Tillery*, 876 F.2d at 1518-19 (applying FC&S Warranty where vessel was seized and stripped by Jamaican officials); *Blaine Richards*, 635 F.2d at 1053 ("the general purposes of the Clause … is to exclude from coverage losses arising from unforeseeable actions of sovereign states against the insured vessel or, in the case of a policy such as this one, the insured cargo. Moreover, the language of the Clause itself declares that such seizures or detentions in time of peace as well as in time of war are to come within the exemption."); *Intermondale Trading Co. v. N. River Ins Co. of N.Y.*, 100 F. Supp. 128, 132 (S.D.N.Y. 1951) (applying FC&S Warranty where shipment of tires was detained on orders from governor of Gibraltar); *Dole v. New England Mut. Marine Ins. Co.*, 88 Mass. 373, 373 (1863) ("A warranty by the insured in a policy of insurance that the vessel shall be free from capture, seizure or detention, includes a capture by a cruiser of the so-called Confederate States.").

Regardless of whether the most direct proximate cause of Chevron's loss was the "seizure" of the *Advantage Sweet* (which it was not) or the "confiscation" of oil (which it was), the FC&S

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

Warranty bars coverage under the Marine Cargo coverage.

**2. <u>There is No Coverage Under the LNG Endorsement</u>**

In an effort to distance itself from the plain language of the Marine Cargo form, Chevron has claimed that the LNG Endorsement – specifically the "War Clauses (LNG)" provision therein – should apply here to expand coverage under the Marine Cargo form. This position is wholly unreasonable. As is evident from the plain language of the Policy, the "War Clauses (LNG)" section of the LNG Endorsement applies only to the transport of LNG, Liquified Natural Gas. This is evidenced not only by the express wording of the Policy, but also by the context of the tailored coverage. For example, in the "RISKS COVERED" section of the "LNG Clauses" in the LNG Endorsement, the Policy reinforces that any recoverable claim will be payable "in excess of customary boil-off and the amount of the subject-matter insured retained in tanks to comply with cooling requirements." (Ex. 1, -17162.) These are requirements distinct to the shipment of LNG, which is shipped in large tanks at cold temperatures, and wholly different from the requirements for shipping crude oil. (Ex. 26 (Davis Dep.) 104:1-105:15.) Witnesses from both Insurers and Chevron confirmed that shipments of LNG involve a different set of risks than those inherent in transporting crude oil, which further supports why a separate Endorsement for LNG would be necessary. (*Id.* 105:23-106:19; Ex. 97 (Blair Dep.) 169:8-170:19; Ex. 98 (Burford Dep.) 129:9-17.) Even Chevron's own broker, Marsh, who drafted the form at issue, recognizes that the LNG Endorsement does not apply to Chevron's crude oil claim, which it repeatedly advised Chevron. (Ex. 8 (Rizvi Dep.) 192:10-193:14; Ex. 51 (Kolbet Dep.) 80:4-16, 81:8-24; Ex. 4 (Riemer Dep.) 354:9-14; Ex. 52, -20609; Ex. 6.) Thus, the LNG Endorsement clearly does not apply to Chevron's claim.

**C. <u>There is No Coverage Under the War Risks Form</u>**

The War Risks form insures against "War Risks" only. Its insuring agreement states:

> This insurance is ***only*** against the risks of capture, ***seizure***, destruction or damage by men-of-war, piracy, takings at sea, arrests, restraints, detainments ***and other warlike operations*** and acts of kings, princes and peoples ***in prosecution of hostilities*** or in the application of sanctions under international agreements, ***whether before or after declaration of war*** and whether by a belligerent or otherwise….

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

(Ex. 1, -17225-26 (emphasis added).) This language has been enforced by case law for more than a century to require the cause of the loss to be ongoing war. In addition, because Chevron cannot show that its loss was proximately caused by "warlike operations" in the "prosecution of hostilities," it cannot succeed at trial.

### 1. The Policy's Requirement for War is Plain and Unambiguous – and Has Been Reinforced by Case Law for 100 Years

#### a. The War Risks Form Insures "Against War Risks Only"

Marsh selected the AIMU War Risks form, which is titled a "Policy of War Insurance" and insures "against War Risks only." This prefatory language governs the entire form, which must therefore be viewed through this lens. *See Kimta AS*, 102 Wash. App. at 728; *Resin*, 489 F. Supp. at 75 (in a matter involving the seizure and sale of goods by Arabian customs officials, "[t]he War Risk policy also does not apply in the present case because the coverage is limited to the risks of war"). An insurer "is entitled to limit its coverage to defined risks, and if it does so in clear language, [the court] will not impose coverage where none was intended." *Am. States Ins. Co. v. Sacramento Plating, Inc.*, 861 F. Supp. 964, 968 (E.D. Cal. 1994), *aff'd*, 99 F.3d 1145 (9th Cir. 1996). In marine insurance policies, "the underwriter is liable for no loss which is not proximately caused by a peril insured against." *Crist v. U.S. War Shipping Admin.*, 163 F.2d 145, 152 (3d Cir. 1947).

To constitute a war risk, the "belligerent characteristic" of the operation must predominate. *Esso Standard Oil Co. v. U.S.*, 122 F. Supp. 109, 111 (S.D.N.Y. 1954), *aff'd*, 221 F.2d 805 (2d Cir. 1955). It is "not enough that the event have as one of its characteristics a 'warlike' nature… [but] that warlike quality must be a primary or principal characteristic of the operation." *Id.* at 111-12. One of the leading cases reviewing war risks policy language concludes that an operation that merely "aggravate[s] or increase[s]" maritime risk is not a "warlike risk." *Queen*, 282 F. at 979. For a loss to be covered under a war risks policy, (1) the vessel's mission must be one of war; and (2) "the warlike character of [the vessel's] operation must be the dominant and effective cause of the resulting catastrophe." *U.S. v. Standard Oil Co. of N.J*, 178 F.2d 488, 490 (2d Cir. 1949), *aff'd sub nom. Standard Oil of N.J. v. U.S.*, 340 U.S. 54 (1950). As detailed below, because Chevron has not met its burden to show the existence of "war risks," it cannot recover under the War Risks form.

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

b. Warlike Operations and Hostilities Require Ongoing War

Case law interpreting the language of the AIMU War Risks form – the narrower form chosen by Marsh for this Policy instead of the broader London Form previously used by Marsh – is unanimous about what is required for a Policy that only covers "seizure[s] … and other warlike operations" that occur "in prosecution of hostilities." For more than a century, maritime cases reviewing war risk coverages using language similar to the AIMU have confirmed that "warlike operations" and "prosecution of hostilities" can ***only*** occur during war. For example, in the leading admiralty decision *Queen*, 282 F. at 979, the Court confirmed that "***hostilities***" means "***an actual operation, either offensive or defensive, in the conduct of war***," while "***warlike operations***" means "***operations in time of war***." (emphasis added.) This definition has been confirmed time and time again. *See, e.g.*, 43 Am. Jur. 2d Insurance § 613 ("The term 'hostilities' in such a policy is intended to describe an actual operation, offensive or defensive, in the conduct of war, and the term 'warlike operations' refers to operations in time of war."); Ex. 99 (Dep. Ex. D-186) ("The phrase 'warlike operations' requires the operations to be conducted during war-time. Losses resulting from the same activity occurring from a peacetime training activity will not be considered a 'warlike operation.'"); *Esso*, 122 F. Supp. at 111 ("We are told that 'hostilities' is intended to describe an actual operation, offensive or defensive, in the conduct of war, and 'warlike operations' as operations in time of war."); *Standard Oil*, 178 F.2d at 493 (war risks policy that "expressly insures against war risks or 'all consequences of hostilities or warlike operations' … extends only to perils due directly to some hostile action, military maneuver, or operational war danager [sic]"); *Panama Transp. Co. v. U.S.*, 155 F. Supp. 699, 705 (S.D.N.Y. 1957), *aff'd sub nom. U.S. as Owner of the Mobilgas v. Panama Transp. Co. & the Esso Balboa*, 253 F.2d 758 (2d Cir. 1958) ("warlike operations" requires the operations to be conducted during wartime).

Another leading case interpreting the AIMU form is *Kimta AS*, 102 Wash. App. 716. *Kimta AS* applied long-standing federal maritime law and is on all fours with this matter. In *Kimta AS*, a vessel transporting seafood was stopped by Russian government authorities for a permit issue. Those authorities then arrested the vessel and cargo on the grounds that the vessel did not comply with

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

orders to return to port. Following Russian judicial proceedings, Russian government authorities then confiscated the cargo and sold it at auction. However, the *Kimta AS* court concluded that the FC&S Warranty barred coverage under the marine cargo part of the policy, to begin with, and that the war risks coverage did not apply "because the seizure was not an act of war." *Id*. at 727.

Chevron has repeatedly stated that the War Risks form does not require war and thus applies in peacetime. To reach that conclusion, Chevron relies on the references in Clause 1(a) to "risks of capture, seizure, destruction or damage" and suggests that such language must be read in isolation, even though this is a policy of "War Insurance" and "against War Risk[s] only." Chevron also ignores the plain language of 1(a), which "only" insures against risks of capture or seizure that are "warlike operations… in prosecution of hostilities…, whether before or after declaration of war." (Ex. 1, -17225-26.) Further, Clause 1(a), unlike the FC&S Warranty, does not include "confiscation" or the phrase "whether in time of peace or war..." Policy phrases must be read in context. Instead, Chevron posits that the purpose of the War Risk form is to give back in its entirety the coverage excluded by the FC&S Warranty in the Marine Cargo form – irrespective of the actual language of the forms. But "[t]here is no authority supporting the argument that [AIMU] war risk coverage has been similarly interpreted to extend to peacetime losses." *Kimta AS*, 102 Wash. App. at 728.

In reviewing identical war risks coverage language, the *Kimta AS* Court expressly rejected Chevron's exact position. There, the insured argued that "if the Free of Capture & Seizure warranty excludes loss caused by a peacetime government seizure, then the war risk policy necessarily reinstates that coverage." *Id.* at 728. The Court concluded that '"***war risk coverage is not as broad as if the Free of Capture and Seizure clause were merely deleted***.'" *Id.* (internal citation omitted (emphasis added).) Specifically:

> The cargo owners also argue that the language of the war risk policy itself includes both war and nonwar risks. They point to the fact that some of the words used in the Free of Capture and Seizure Clause are also used in the war risk policy, such as "capture", "seizure", and "arrest". ***But in the war risk policy these words are modified by the phrase "and other warlike operation and acts" and "in prosecution of hostilities***". As might be expected from the policy's title, "War Risk Only", these modifying phrases unambiguously limit the policy's coverage to war risks. The trial court properly found the war risk policy inapplicable to cargo seizures outside of the context of war.

*Id*. at 728-29 (emphasis added.).

That the War Risks form requires actual war given its requirement of "hostilities" is consistent with the War Powers Resolution, which addresses situations in which U.S. armed forces are introduced "into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances." 50 U.S.C. § 1543(a)(1). Unless Congress declares war or authorizes the continuation of military action, the War Powers Resolution requires the President of the United States to terminate hostilities after 60 days. *Id*. § 1544(b). Various administrations have confirmed that this requirement for "hostilities" requires active, ongoing war. For instance, the Ford Administration confirmed that "hostilities" were those situations where "units of the U.S. armed forces are actively engaged in exchanges of fire with opposing units of hostile forces."[12] When U.S. forces downed two Libyan fighter jets in August 1981, the Reagan Administration confirmed that this did not rise to the level of "hostilities" because the Administration "anticipated no further action" from Libya.[13] Similarly, when U.S. aircraft assisted Saudi Arabia in shooting down two Iranian aircraft in the Persian Gulf, the Reagan Administration stated that this "one time, unanticipated incident did not trigger the [Resolution] because of the absence of hostilities."[14] Under the Obama Administration, the U.S. launched a series of airstrikes over Libya in 2011. Although the Obama Administration delivered a required report to Congress within 48 hours, a Legal Adviser for the U.S. Department of State confirmed that these were not hostilities: "when U.S. forces engage in a limited military mission that involves limited exposure for U.S. troops and limited risk of serious escalation and employs limited military means, we are not in hostilities of the kind envisioned by the War Powers Resolution."[15] This mirrors the case law interpreting the Policy language at issue.

---

[12] Letter from Monroe Leigh, Legal Adviser, U.S. Dep't of State, and Martin R. Hoffman, Gen. Counsel, U.S. Dep't of Def., to Hon. Clement J. Zablocki, Chairman, Subcomm. on Int'l Sec. & Sci. Affairs, Comm. on Int'l Relations, U.S. House of Representatives (June 3, 1975), in *War Powers: A Test of Compliance: Hearings Before the Subcomm. on Int'l Sec. & Sci. Affairs of the House Comm. on Int'l Relations*, 94th Cong. 38-40 (1975).

[13] Overview of the War Powers Resolution, 8 Op. O.L.C. 271, 279 (1984)

[14] *Id.* at 280.

[15] *Libya and War Powers: Hearing Before the S. Foreign Relations Comm.*, 112th Cong. 7-11 (2011) (statement of Harold Hongju Koh, Legal Adviser, U.S. Dep't of State).





MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

c. Even Situations Involving Actual War Still Require Evidence that War Caused the Claimed Injury

Even in instances in which a claim is made under similar war risks forms during an actual declared war, that is not the end of the inquiry. That is because a court must still review whether a loss that occurs during wartime was actually caused by the perils of war. For example, in *Queen*, 282 F. 976, the Second Circuit and Supreme Court reviewed a head-on maritime collision between two merchant vessels that occurred during World War I. The merchant vessels were travelling in a convoy protected by U.S., British, and Italian warships under the command of a British officer, who ordered that the convoy should proceed without lights due to a recent submarine attack in the area. After the vessels collided in the darkness, the loss was determined to be caused not by the war, but by the collision itself, which is solely a marine peril and could have happened even if there was no war going on. *See also Panama Transp.*, 155 F. Supp. at 706 ("where faulty navigation is the proximate cause of a collision between two vessels engaged in warlike operations, the war risk insurance will not cover the resulting loss"). Thus, even losses that occur during purported wartime are not covered unless the loss was caused by perils that only exist during a war.

d. The War Risks Form Requires a Declaration of War

The War Risks form insures warlike operations in prosecution of hostilities "whether before or after declaration of war." This confirms that there may be coverage where a declaration of war is in effect or is imminent. It is a temporal and causal limitation that reinforces the need for actual, ongoing war. The Primary Insurers each testified as to their understanding that the Policy requires a declaration of war. (*See, e.g.*, Ex. 56 (Eugenio Dep.) 79:11-16; Ex. 100 (Patterson Dep.) 156:10-15; Ex. 57 (Zrebiec Dep.) 79:19-22.) Notably, in response to the Ukraine-Russia war and the Israel-Hamas war, AIMU, who is the drafter of the war risks form used here, released Frequently Asked Questions to explain the requirements for coverage under this form. Therein, AIMU confirms that "the War Risk policy responds to acts of war and aggression." (Ex. 101 (P-280) p.3.) AIMU also relies on the OED definition in defining the common understanding of a "war": "To be classified as a war, the conflict must be ***widespread, intentional, and declared***. It requires mobilization of personnel and fighters or soldiers moving to front positions to defend territories." (*Id.* (emphasis

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

added).) Zurich referenced this in correspondence to Chevron disputing coverage for the claim on January 5, 2024, prior to this litigation. (Ex. 72, -08010 n.2.) In March of 2026, AIMU re-released its FAQ document, noting its application to the current "Iran War." (Ex. 102.)

This interpretation of the Policy to require a declaration of war is reasonable, particularly when compared to the language of the FC&S Warranty. The FC&S Warranty excludes coverage for "hostilities or warlike operations (whether there be a declaration of war or not)." (Ex. 1, -17198.) The War Risks form uses wholly different language; instead of saying it applies whether there is a declaration or not, the War Risks form requires that covered events must occur before or after a declaration (confirming that there, in fact, must be a declaration). Marsh's selection of the AIMU War Risks form (which requires a declaration of war) instead of the London Form (which does not) means that this language is binding.

### 2. <u>There Were No "Warlike Operations" in Prosecution of "Hostilities"</u>

Maritime law requires that decisions interpreting maritime policies be applied uniformly across courts. *See, e.g.*, *Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 65 (2024) (summarizing that Article III "contemplates a uniform system of maritime law across the country" and calls on federal courts to follow "established maritime rules"); *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1424 (9th Cir. 1990) ("Our circuit has also acknowledged the importance of uniformity in admiralty law."). Here, this Court must apply the continuous line of maritime decisions that unreservedly conclude that this Policy language requires war. The U.S. and Iran were not at war in April 2023 or March 2024; this is dispositive to coverage. Moreover, the facts reveal that the confiscation of Chevron's oil (and even the seizure of the *Advantage Sweet*) were not inherently "warlike operations" nor done in "prosecution of hostilities." Even if there were an ongoing declared war (which there decidedly was not), the insured must still show that the alleged harm was the "result of a warlike operation." *Nordling v. Gibbon*, 62 F. Supp. 932, 934 (S.D.N.Y. 1945); *see also Standard Oil Co. of N.J. v. St. Paul Fire & Marine Ins. Co.*, 59 F. Supp. 470, 475 (S.D.N.Y. 1945).

#### a. <u>The U.S. and Iran Were Not At War in April 2023 or March 2024</u>

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

As every case and treatise has recognized, a War Risks policy like the one here requires ongoing war. The U.S. and Iran were not at war in 2023 and 2024, confirmed by the absence of any declaration of war. This fact cannot reasonably be disputed. The fact that the U.S. and Iran were not at war at the time of the seizure of the *Advantage Sweet* or the subsequent confiscation of Chevron's cargo is the beginning and end of the inquiry.

Chevron takes the view that the United States and Iran have been engaged in a covert, undeclared, and unending "shadow" or "grey zone" war for the last 47 years, beginning with the Iranian revolution in 1979. (Ex. 18 (Thompson Dep. Vol. 1) 176:14-20, 97:3-11; Ex. 30 (Ross Dep.) 186:17-25.) It is Chevron's position that this secret war – purportedly fought through the use of tariffs, sanctions, Iran's "hassling" and "attacks" of commercial vessels, and political tensions – triggers coverage. This position is neither correct nor even rational. Chevron's Chief Security Officer, David Bancroft, presented Chevron's view about ongoing "shadow" war and testified that warfare between nations occurs any time one country attempts "to influence another country's way of thinking." (Ex. 39 (Bancroft Dep.) 40:10-16, 64:8-13.) Mr. Bancroft agreed that his definition of "warfare" includes economic tariffs and sanctions, noting that, based on this view, the United States was (as of his deposition in November 2025) involved in warfare with "dozens" of countries, including the United Kingdom. (*Id*. 34:19-35:7, 40:17-41:6, 64:14-20.) This is not sensible as a matter of objective fact and is not compatible with the plain language of the Policy. Indeed, "hostilities" have been defined by maritime case law to require open war involving ongoing, pervasive, widespread military action, not a secret or undefined metaphorical war based on economic pressures. *See, supra* §V.C.1(a)-(d); *see also Samuels v. United Seamen's Serv. Inc.*, 165 F.2d 409, 412 (9th Cir. 1948) (finding that lease tied to "cessation of hostilities in the present war with Japan" referred to "termination of open and hostile warfare activity which was effected on V-J Day").

Multiple experts in this case, including Chevron's, have testified that although the U.S. and Iran have had a strained diplomatic relationship at times historically, both parties (until very recently) took care to stay short of the "red line" of hostilities. (Ex. 16, p. 15; Ex. 103 (Ralby Dep.) 324:18-23; Ex. 104 (Eyre Dep.) 195:19-196:8, 197:4-19.) Government records from the time of the seizure

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

of the *Advantage Sweet* and confiscation of oil also confirm that the U.S. Government did not view Iran as a relationship involving war or ongoing hostilities. (Ex. 16, pp. 21-23; Ex. 104 (Eyre Dep.) 212:12-213:12.) Rather, the United States Government prioritized sanctions aimed at exerting economic pressure on Iran, including sanctions against the *Suez Rajan* (which led to Iran's retaliatory seizure of the *Advantage Sweet*).

Primary Insurers' expert on U.S.-Iran relations is Alan Eyre, a 40-year veteran diplomat with the State Department, U.S. Army, and intelligence community, whose career has focused on the U.S.-Iran relationship. He testified that at the time of the vessel seizure, the countries were not at war, which he defined to be "armed conflict … between two nations." (Ex. 104 (Eyre Dep.) 178:5-11, 179:1-3.) He has opined that it is common to describe other events as metaphorical war – such as the War on Drugs or "shadow warfare" – but that from a diplomatic and international relations perspective, those are not instances of war involving armed conflict. (*Id*. 187:7-188:1.) His opinion is that the relationship between the U.S. and Iran changed in the summer of 2025 with the U.S.'s launch of Operation Midnight Hammer (the bombing of Iran nuclear sites to interfere with Iran's nuclear proliferation capability) and then in February 2026 with Operation Epic Fury (for the same reason). These Operations were "the start of an essentially different bilateral relationship" between the countries and represent a significant departure. (*Id*. 227:17-229:10.) Prior to that, Mr. Eyre opines, Iran's motivation was to avoid "triggering of what could lead to a war between the United States and Iran." (*Id*. 218:5-13.) Even in the context of Iranian seizures of commercial vessels, Mr. Eyre confirmed that such acts were a "strategic" and "retaliatory" response to economic sanctions, but not an effort to engage in war. (*Id*. 162:12-164:13, 246:22-247:16.)

That there was not war in the Gulf of Oman in 2023 and 2024 is further confirmed by the undisputed facts regarding Chevron's own maritime practices. In approving the chartering of the *Advantage Sweet* vessel, Chevron's internal review system did not raise any red flags indicating that the vessel would be traveling through a "war zone." Its internal review did not result in further assessment of the voyage by the company's Chief Security Officer, as Chevron required for high-risk voyages. Chevron's corporate designee and Vice President of Shipping, Barbara Pickering, also

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

confirmed at her deposition that "hassling" of merchant ships in the Gulf of Oman did not make the area a war zone, but instead impeded freedom of navigation in international waters. (Ex. 29 (Pickering Dep.) 169:19-170:17.) This is consistent with the view of the P&I Club that separately insured the vessel and crew and denied the crew members' claims of extra compensation because the vessel was not in a "warlike operations area" or a "high risk zone" for purposes of coverage. (Ex. 64, -03683.) Even after the seizure of the *Advantage Sweet*, Chevron did not make any changes to its shipments in that region as a result, which confirms that Chevron did not view the area as an active war zone with sustained and unavoidable risk.

There are no government records suggesting that the U.S. and Iran were at war or had declared war at the time of the seizure or the confiscation. It is undisputed that the military did not launch any operations in response to the seizure of the *Advantage Sweet* or the confiscation of Chevron's oil, nor did the U.S. declare war in response. Instead, the Fifth Fleet of the Navy issued a public statement characterizing Iran's seizure of the vessel "contrary to international law" and calling on Iran to "immediately release the oil tanker." (Ex. 41, -21314.) Surely if the seizure of the vessel had happened in the midst of an ongoing war between the United States and Iran, there would have been a more kinetic response from the U.S. Government than the release of a statement. In the wake of the *Advantage Sweet* seizure, Chevron also communicated with several high-level members of the U.S. Government, none of whom ever informed Chevron that the seizure was part of an ongoing war. To the contrary, the continuing "tit for tat" of civil seizures was characterized as political tensions between the countries – but always stopping short of war. (*See, e.g.*, Ex. 65; Ex. 66 (Sweeney Dep.) 85:1-19, 151:22-152:14; Ex. 105 (P-213) -14968.) [redacted] (Ex. 66 (Sweeney Dep.) 151:22-152:14; Ex. 105, -14968.) [redacted] (*Id.*) The Policy does not cover losses arising from escalating political tensions.

To the extent Chevron suggests that companies face risks from sources other than traditional war, that is true – and there are other types of insurance that address those risks (such as political risk

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

coverage, for which Chevron elected to self-insure). But for War Risks coverage, the fact that the U.S. and Iran were not at war at the time of the claimed loss is fatal to Chevron's coverage position.

b. The Confiscation of Chevron's Oil Occurred by Court Order

The Policy excludes "confiscations" in the Marine Cargo coverage and does not bring that coverage back via the War Risk policy. The War Risk policy by its plain language simply does not cover confiscations.

Moreover, the event by which the Iranian government confiscated Chevron's oil – via a court order, scheduled ship-to-ship transfer, and a warning that there could be further "court proceedings" – is neither inherently warlike nor part of ongoing hostilities. Even if there were war between the United States and Iran at the time of the confiscation – which there was not – that war would need to be the context in which the confiscation of the oil occurred. Instead, the context in which the confiscation of the oil occurred was an Iranian court's apparent order of confiscation and the "tit for tat" activity by Iran in responding to the seizure of a vessel by the United States.

It is undisputed that the justification given by Iran for the confiscation was a court order.[16] A court order obviously does not constitute warlike operations, as conceded by Chevron at deposition. (Ex. 18 (Thompson Dep. Vol. 1) 255:25-256:9.) [redacted] (Ex. 86, -21872.) [redacted] (Ex. 3, -04494.) These acts were neither inherently "warlike operations" nor a consequence of "hostilities." *See Standard Oil*, 178 F.2d at 490 (under a war risks policy, loss is only a consequence of hostilities where "one of the vessels party to the loss is both engaged in a warlike operation and so navigating as a result of the war that it creates a peril"); *Resin*, 489 F. Supp. at 75 ("a cursory reading of the War Risk policy indicates that it does not cover the loss in this case … because the loss was not war-related"). A court order and the potential of future judicial proceedings are, in many ways, the opposite of war. Unlike actions on a battlefield,

---

[16] Chevron's Rule 30(b)(6) designee also testified that [redacted]. (Ex. 40 (Thompson Dep. Vol. 2) 50:8-13.)

a court order confiscating oil does not trigger coverage under a War Risks form.

c. The Seizure of the Third-Party Vessel Was Not Warlike or in Prosecution of Hostilities

As noted above, Chevron's loss did not occur until the Iranian government confiscated its oil, not when the Iranian Navy seized the *Advantage Sweet*. Nonetheless, the seizure of the vessel was also neither warlike nor in prosecution of hostilities. For there to be coverage, "the warlike character of [the vessel's] operation must be the dominant and effective cause of the resulting catastrophe." *Standard Oil*, 178 F.2d at 490. Here, the operation of the *Advantage Sweet* was not warlike in character, but neither was the operation of the Iranian vessel that seized the *Advantage Sweet*. That is because it is undisputed that the purpose of the seizure of the *Advantage Sweet* was merely financial, to compensate Iran for the seizure by the U.S. of the *Suez Rajan*. This economic "tit for tat" is not a "warlike character."

[redacted] (Ex. 18 (Thompson Dep. Vol. 1) 257:12-16.) Likewise, Iran's reciprocal seizure of the *Advantage Sweet* was not a warlike operation. Moreover, beyond the fact that it occurred during peacetime, the boarding and seizure of the vessel also did not involve any common characteristics of warlike operations: no shots were fired, no weapons discharged, no one was injured or killed, and no property damaged. Chevron concluded after a thorough investigation that the crew were treated well, were not ransomed, and had daily contact with their families. The crew were even rotated out multiple times during the 11-month period between the seizure and the confiscation, which is also not consistent with a warlike operation. In the absence of "warlike operations," there is no coverage.

**3. Chevron Self-Insured For Peacetime Seizures and Political Tensions**

The political tensions between the U.S. and Iran in 2023 and 2024 – including the "tit for tat" retaliatory taking of Chevron's oil by the government of Iran – is the precise type of loss that is typically addressed by political risk coverage, not war risk coverage.

As Chevron's Director of Risk Management testified, political risk insurance typically covers "confiscation [and] expropriation-type political risks." (Ex. 15 (Wondolleck Dep.) 54:1-4.) Indeed, IRMI defines political risk insurance as coverage for companies "conducting operations in foreign

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 Powell Street, Suite 1050
Emeryville, California 94608
Telephone: (510) 900-9371 Facsimile: (510) 900-9381

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

countries" to protect them from "governmental action either foreign or domestic," including "confiscation, expropriation, [and] deprivation." (Ex. 106 (https://www.irmi.com/term/insurance-definitions/political-risk-insurance).) Specifically, political risk insurance can provide "coverage for businesses with an ownership interest in property abroad to cover loss from government nationalization of the property or other action by the government that effectively deprives the insured of the property or restricts its operations." (Ex. 107 (https://www.irmi.com/term/insurance-definitions/confiscation-expropriation-nationalization-and-deprivation-insurance).)

Marsh pitched Chevron on the possibility of purchasing political risk insurance. (Ex. 14, -01919.) Chevron testified that it elected to self-insure for political risk because it has sufficient cash to cover such a loss. (Ex. 15 (Wondolleck Dep.) 54:1-5; Ex. 4 (Riemer Dep.) 59:1-60:11.) Chevron chose not to buy the coverage that could potentially apply to an international political situation falling short of declared war. Chevron must live with the consequences of that choice.

**4. The War Risk Form's Frustration of Voyage Warranty Bars Coverage**

Even if this Court concludes that Chevron's claimed loss reflects a "war risk" constituting "warlike operations" during "hostilities," Chevron's claim is still barred by the War Risks form's Frustration of Voyage Warranty ("FOV"). The FOV Warranty provides that coverage is "[w]arranted free from any claim based upon loss of, or frustration of, the insured voyage or adventure caused by arrests, restraints or detainments." (Ex. 1, -17226.) There can be little doubt that the *Advantage Sweet* could not complete its voyage because it was restrained.

In *Batta v. Home Insurance Co. of New York*, 56 F. Supp. 967 (N.D. Cal. 1944), this Court reviewed a similar exclusion in a war risk policy in a situation involving a vessel sailing to the Philippines. The ship was ordered by the British Navy to return to Honolulu instead of sailing to Asia in the wake of the Pearl Harbor attacks and was further ordered to sell its goods in Honolulu. Because the goods were sold at a loss, the insured sought recovery under a marine policy and a war risk policy. Although the Court recognized that the incident would otherwise trigger coverage under the war risk policy during the U.S. involvement in World War II, the Court confirmed the denial of coverage because the sale of the merchandise at a lower price "actually resulted from a 'frustration'

of the voyage of the S.S. Roseville, a risk specifically excluded under the terms of the policy." *Id.* at 968. Because the cargo on board the *Advantage Sweet* was similarly unable to continue its intended transit, the FOV Exclusion should bar coverage for Chevron's loss.

### D. Primary Insurers Did Not Act in Bad Faith in Denying Coverage for the Claim

Chevron cannot meet its burden to show that Primary Insurers acted in bad faith in denying coverage on May 7, 2024. Primary Insurers are entitled to judgment on Chevron's cause of action for bad faith because Chevron cannot sustain its claim as a matter of law, irrespective of the outcome of the parties' coverage case.

#### 1. There is a Reasonable Dispute Over Coverage

As a matter of law, if this Court agrees that there is no coverage for Chevron's claim, then the Primary Insurers did not act in bad faith in denying coverage. *Sony Comput. Entm't Am., Inc. v. Am. Home Assurance Co*., 532 F.3d 1007, 1021 (9th Cir. 2008) (citing *Love v. Fire Ins. Exch*., 221 Cal. App. 3d 1136, 1152-53 (1990)) ("if there is no coverage, there can be no bad faith in refusing coverage"). But even if this case survives to trial, Chevron's bad faith claim should not continue. That is because there is a reasonable dispute between the parties over coverage.

"It is well established that an insurer does not act in bad faith so long as a genuine dispute exists over an insured's coverage." *Keshish v. Allstate Ins. Co*., 959 F. Supp. 2d 1226, 1233 (C.D. Cal. 2013) (internal quotation marks and citation omitted); *see also Lunsford v. Am. Guar. & Liab. Ins. Co*., 18 F.3d 653, 656 (9th Cir. 1994) ("[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability.") (citation omitted). The Ninth Circuit has repeatedly affirmed the dismissal of bad faith claims after finding a genuine dispute as to coverage. *See, e.g., Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc*., 971 F.2d 272, 282-83 (9th Cir. 1992) (affirming directed verdict in favor of insurer on bad faith, even where insurer's interpretation of contract was incorrect, because "the interpretation is not so unreasonable as to be a mere pretext for avoiding further investigation; a genuine issue did exist concerning liability"); *Franceschi v. Am. Motorists Ins. Co*., 852 F.2d 1217, 1220 (9th Cir. 1988) (affirming summary judgment in insurer's favor on bad faith claim where there

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

was a genuine dispute over coverage).

Here, the reasonable and genuine dispute over coverage is evident. Primary Insurers are relying on substantial case law interpreting the precise policy language that legitimately supports Primary Insurers' positions. It is also undisputed that claims under war risk policies are rare and uncommon; the need for Court resolution illustrates the genuineness of the dispute.

The fact that Chevron's broker Marsh repeatedly noted both that (1) there is no coverage under the Marine Cargo form and (2) the confiscation of the oil by Iran complicated the claim and could give rise to a denial of coverage, also supports the existence of a genuine dispute. Early on in the matter, Marsh also commented internally that it should avoid commenting on coverage given the potential complexity of the fact-dependent inquiry. If Marsh – who acted as an advocate for Chevron and selected the policy forms – was certain there was not coverage under the Marine Cargo form[17] and understood there could be a dispute over the War Risks form, how could it be bad faith for the Primary Insurers to reach the same conclusion? "It is not unreasonable for an insurer to resolve good faith doubts about the claim against the claimant." *Cardiner v. Provident Life & Acc. Ins. Co.*, 158 F. Supp. 2d 1088, 1105 (C.D. Cal. 2001).

Primary Insurers openly shared their coverage position with Chevron and Marsh and detailed their efforts to investigate the claim. Primary Insurers exchanged several letters with Chevron, met with Chevron and Marsh face-to-face to discuss and try to resolve their positions, detailed their denial after the receipt of the Proof of Loss, and then affirmatively filed this lawsuit to ensure that the parties' rights could be adjudicated. This is a total defense to bad faith.

### 2. <u>Primary Insurers Took Reasonable Steps to Investigate Coverage</u>

Chevron has made several blanket allegations of bad faith in this case, which are conclusory and do not reflect the facts. Instead, the facts show that Primary Insurers conducted a thorough and detailed investigation, bearing the hallmarks of a good faith effort to understand the underlying claim and Chevron's positions within the terms of the Policy. Chevron's contentions of bad faith primarily

[17] This is especially true for the application of the LNG Endorsement. It cannot be bad faith for Primary Insurers to take the exact same position on this coverage as Chevron's claims advocate.

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

concern a disagreement over coverage, which Chevron simply restates in several ways and is not actionable as a matter of law, as described above.

Chevron contends that Primary Insurers acted in bad faith by (1) failing to conduct a full, fair, and prompt investigation; (2) engaging in "predetermined, counsel-driven claims handling"; (3) denying coverage contrary to plain policy language covering hostile acts and warlike operations; (4) relying on a requirement for "declared war" (when Chevron disputes that a declaration of war is required); and (5) only agreeing to provide war risks coverage for a "48-hour cancellation window." (Ex. 108 (Dep. Ex. P-208) pp. 8-13.)

The record contradicts Chevron's conclusions about the investigation (point (1) above). The facts show that Zurich, as lead insurer, spearheaded an investigation and began reviewing facts and requesting information immediately upon the receipt of the notice of the "potential claim." Primary Insurers retained Kennedys in the U.K. to assist with the factual investigation and to consult with resources that apparently were not otherwise available to Chevron (such as the P&I Club in London). Chevron has not explained how Primary Insurers' investigation could have been deficient if Primary Insurers worked to contact third-party sources and gather facts that Chevron itself was unable to access in its own investigation. The record shows that all the Primary Insurers reviewed the facts, conducted an investigation into coverage, and were all in lockstep with each other regarding the coverage decision. Denying coverage is not bad faith "if the insurer conducts a 'thorough and fair' investigation, after which there remained a 'genuine dispute' as to coverage liability." *Duncan v. State Farm Mut. Auto. Ins. Co.*, 494 F. Supp. 3d 742, 753 (E.D. Cal. 2020) (quoting *Bravo v. U.S. Life Ins. Co. in City of N.Y.*, 701 F. Supp. 2d 1145, 1159 (E.D. Cal. 2010)); *Doe v. State Farm Gen. Ins. Co.*, No. 23-CV-04734-JSC, 2024 WL 4476654, at *5-6 (N.D. Cal. Oct. 11, 2024) (Corley, J.).

The Primary Insurers' internal communications confirm that their review of the facts and Policy language was fulsome. Some points were readily apparent to both Primary Insurers *and Marsh* from the outset (such as that the FC&S Warranty would exclude "seizures"), while others led Primary Insurers, Marsh, and Chevron to discuss their positions in calls, meetings, and correspondence over the course of several months. Primary Insurers repeated to Chevron that they

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

did not see a path to coverage in the absence of an ongoing war, but continued to investigate and work with Chevron as the matter developed, before denying coverage after Chevron's eventual Proof of Loss. The communications were always professional and never aggressive or dismissive. Primary Insurers' retention of both investigatory counsel and coverage counsel actually evidences good faith; surely if Primary Insurers proceeded without the involvement of Kennedys' factual investigation or without retaining coverage counsel, Chevron would maintain that Primary Insurers' investigation was incomplete.[18] *Ayala v. Infinity Ins. Co.*, 713 F. Supp. 2d 984, 988 (C.D. Cal. 2010) ("Defendant's retention of outside counsel indicates good faith.").

Moreover, even if Chevron were correct in its characterization of the investigation – which Primary Insurers dispute – Chevron must prove that the insurers' allegedly bad faith conduct proximately caused it to suffer damages. *Emerald Bay Cmty. Ass'n v. Golden Eagle Ins. Corp.*, 130 Cal. App. 4th 1078, 1094; *RFS Invs. Co., LLC v. Travelers Prop. Cas. Co. of Am.*, No. LACV1709212JAK(ASX), 2019 WL 1976470, at *6 (C.D. Cal. Mar. 8, 2019) ("a plaintiff must demonstrate that he was harmed by the defendant's conduct") (citation omitted); *Philadelphia Indem. Ins. Co. v. Gotham Mgmt., LLC*, No. 16CV673 NLS (JMA), 2017 WL 11421367, at *3 (S.D. Cal. May 23, 2017). Chevron has failed to adduce any facts that suggest the outcome in this case was impacted by the alleged deficiencies in Primary Insurers' investigation. Chevron does not maintain that Primary Insurers missed a critical development or failed to consider key facts. *See Ayala*, 713 F. Supp. 2d at 987 (granting summary judgment in insurer's favor on bad faith because "[insured] fails to dispute any fact upon which [insurer's] investigation was based").

Chevron's remaining accusations of bad faith are simply restated versions of Chevron's objection to Primary Insurers' coverage decision. The fact that Primary Insurers simply reached a different coverage position than the one advocated by Chevron does not mean that the Primary Insurers acted in bad faith. *See Mason v. Mercury Cas. Co.*, 64 Cal. App. 3d 471, 475 (1976) ("Every decision of an insurer adverse to the insured is not evidence, and certainly not conclusive evidence,

---

[18] There is no evidence that Primary Insurers wholly abdicated their investigation to outside counsel; rather, the claims files reflect thorough communications and assessment by claims professionals.

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381

of bad faith on the part of the insurer.”). For all the reasons explained above, Primary Insurers’ coverage position was reasonable and based on policy language and law.

In addition, the undisputed facts contradict the conclusory arguments raised in points (2), (3), (4), and (5). As just one example, Chevron’s argument that Primary Insurers denied coverage contrary to policy language covering “hostile acts” is misleading. That language is not in the War Risks form – it is only in the LNG Endorsement. As another example, Chevron’s argument that Primary Insurers essentially only agreed to provide 48 hours of war risks coverage – because the War Risks form has a mutual cancellation provision with a 48-hour notice period – is also misleading. Chevron argues that even if seizure or confiscation triggered War Risks coverage, Primary Insurers would have canceled it after 48 hours. But that simply did not happen here. It cannot be bad faith, as a matter of law, for Chevron to complain about a hypothetical action. Moreover, the 48-hour cancellation term is standard in war risk policies, as Marsh conceded, and is a provision meant to address evolving catastrophic risk. This does not evidence bad faith.

Judgment on Chevron’s bad faith cause of action is proper.

## VI. CONCLUSION

For the reasons stated above, Primary Insurers are entitled to summary judgment on their claims and on Chevron’s counterclaims.

Dated: April 20, 2026

DENTONS US LLP

By: */s/ Shari L. Klevens*
Shari L. Klevens
Alanna Clair

- and -

MOUND COTTON WOLLAN & GREENGRASS LLP

By: */s/ Jonathan Gross*
Jonathan Gross

- and -

GRASSO MOELLER LLC

By: <u>*/s/ Joseph Grasso*</u>
Joseph Grasso

Attorneys for Plaintiffs
ZURICH AMERICAN INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY and GREAT AMERICAN INSURANCE COMPANY

MOUND COTTON WOLLAN & GREENGRASS LLP
2200 POWELL STREET, SUITE 1050
EMERYVILLE, CALIFORNIA 94608
TELEPHONE: (510) 900-9371 FACSIMILE: (510) 900-9381