**McGuireWoods LLP**
Anthony P. Tatum (Appearance *pro hac vice*)
1075 Peachtree St. NE, 35th Floor
Atlanta, GA 30309
Phone: 404-443-5500
Fax: 404-443-5599
ttatum@mcguirewoods.com

Michael S. Gehrt (SBN 246450)
Mikaela Whitman (SBN 338622)
Kelsey D. Haines (SBN 327536)
1800 Century Park East, 8th Floor
Los Angeles, CA 90067-1501
Phone: 310-315-8200
Fax: 310-315-8210
mgehrt@mcguirewoods.com
mwhitman@mcguirewoods.com
khaines@mcguirewoods.com

Jenny Yi (SBN 314540)
201 Clay St., Suite 1300
San Francisco, CA 94111
Phone: 415-844-9944
Fax: 415-844-9922
jyi@mcguirewoods.com

Dylan M. Bensinger (SBN 318107)
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Phone: 704-343-2000
Fax: 704-343-2300
dbensinger@mcguirewoods.com

*Attorneys for Defendants and Counterclaim Plaintiffs Chevron U.S.A. Inc. d/b/a Chevron Products Company and Chevron Corporation.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, and GREAT AMERICAN INSURANCE COMPANY,<br><br>Plaintiffs/Counterclaim Defendants<br>v.<br><br>CHEVRON U.S.A. INC. d/b/a Chevron Products Company (a division of Chevron U.S.A. Inc.) and CHEVRON CORPORATION,<br><br>Defendants/Counterclaim Plaintiffs. | CASE NO. 3:24-cv-02733-JSC<br><br>Hon. Jacqueline Scott Corley<br><br>**DEFENDANTS/COUNTERCLAIM PLAINTIFFS CHEVRON U.S.A. INC. D/B/A CHEVRON PRODUCTS COMPANY AND CHEVRON CORPORATION'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE TESTIMONY OF ALAN EYRE REGARDING MARITIME MATTERS, AN ALLEGED IRANIAN COURT ORDER AND OPINIONS BASED** |

v.

ROYAL AND SUN ALLIANCE INSURANCE LTD.; LLOYD'S UNDERWRITER SYNDICATE NO. 1414 ASC; LLOYD'S UNDERWRITER SYNDICATE NO. 1225 AES; LLOYD'S UNDERWRITER SYNDICATE NO. 2232 AWH; LLOYD'S UNDERWRITER SYNDICATE NO. 1274 AUL; LLOYD'S UNDERWRITER SYNDICATE NO. 0609 AUW; LLOYD'S UNDERWRITER SYNDICATE NO. 2987 BRIT; LLOYD'S UNDERWRITER SYNDICATE NO. 4444 CNP; LLOYD'S UNDERWRITER SYNDICATE NO. 2488 CGM; LLOYD'S UNDERWRITER SYNDICATE NO. 3000 MKL; NAVIUM MARINE LIMITED; and FIDELIS UNDERWRITING LIMITED.

Counterclaim Defendants.

**ON IRANIAN STATE-CONTROLLED NEWS OUTLETS**

**DATE:** JULY 14, 2026
**TIME:** 10:00 A.M.
**COURTROOM:** 8

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on July 14, 2026, at 10:00 a.m., or as soon thereafter as the matter can be heard in Courtroom 8 of the above-entitled Court, located at 450 Golden Gate Ave., San Francisco, CA 94102, Defendants Chevron U.S.A. Inc. d/b/a/ Chevron Products Company (a division of Chevron U.S.A. Inc.) and Chevron Corporation, (together, "Chevron"), will, and hereby do, move the Court to exclude certain testimony of Alan Eyre pursuant to Federal Rule of Evidence 702, including that testimony concerning (1) maritime matters; (2) Iran law, including an alleged Iran court order; and (3) opinions based on Iran state-controlled news outlets. Chevron bases this motion on the accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action, oral argument as permitted by the Court, and any such other matters that the Court deems appropriate.

Dated: April 20, 2026

**McGuireWoods LLP**

By: */s/ Mikaela Whitman*

Mikaela Whitman
Anthony P. Tatum (appearance pro hac vice)
1075 Peachtree St. NE, 35th Floor
Atlanta, GA 30309
Phone: 404-443-5500
Fax: 404-443-5599
ttatum@mcguirewoods.com

Michael S. Gehrt (SBN 246450)
Mikaela Whitman (SBN 338622)
Kelsey D. Haines (SBN 327536)
1800 Century Park East, 8th Floor
Los Angeles, CA 90067-1501
Phone: 310-315-8200
Fax: 310-315-8210
mgehrt@mcguirewoods.com
mwhitman@mcguirewoods.com
khaines@mcguirewoods.com

Jenny Yi (SBN 314540)
201 Clay St., Suite 1300
San Francisco, CA 94111
Phone: 415-844-9944

Fax: 415-844-9922
jyi@mcguirewoods.com

Dylan M. Bensinger (SBN 318107)
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Phone: 704-343-2000
Fax: 704-343-2300
dbensinger@mcguirewoods.com

*Attorneys for Defendants and Counterclaim Plaintiffs*

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 3

III. ARGUMENT .......... 4

A. Mr. Eyre's Opinions on U.S. Policy Vis-à-Vis Iran Would Not Help the Trier of Fact Determine a Fact in Issue. .......... 4

B. Mr. Eyre Is Not Qualified to Opine on Maritime Matters. .......... 4

1. Mr. Eyre Lacks Expertise in Maritime Security, Maritime Trade, Shipping, or Naval Warfare. .......... 5

2. Mr. Eyre Lacks the Requisite Knowledge, Skill, Experience, and Training to be an Expert on Maritime Security or Naval Warfare. .......... 5

C. The Court Should Preclude Mr. Eyre From Testifying About Matters of Iran Law .......... 8

1. Mr. Eyre Is Not Qualified to Give Expert Opinions on Iran Legal Matters. .......... 8

2. Mr. Eyre's Testimony Regarding the Alleged Iran Court Order Should Be Excluded Because It Is Based on Speculation. .......... 8

D. Mr. Eyre's Opinions on Iranian State-Controlled News Outlets Should Be Excluded as Unreliable and Speculative. .......... 10

IV. CONCLUSION .......... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AGA & Titan Inc. v. United Specialty Ins. Co.*,
No. 2:20-CV-02698-MCS-AS, 2021 WL 4783636 (C.D. Cal. Oct. 12, 2021).................... 5, 7

*Banda v. Herc Rentals, Inc.*,
No. 18-CV-05329-JCS, 2020 WL 353461 (N.D. Cal. Jan. 21, 2020) ..................................... 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ....................................................................... 3, 5, 6, 8, 10, 11, 12

*Droplets, Inc. v. Yahoo! Inc.*,
No. 12-CV-03733-JST, 2021 WL 11701485 (N.D. Cal. Nov. 29, 2021) ................................ 5

*Int'l Swimming League, Ltd. v. World Aquatics*,
2025 WL 3257200 (N.D. Cal. Nov. 21, 2025).............................................................. 11, 12

*Kumho Tire Co. LTD. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................................................. 3

*Messick v. Novartis Pharms. Corp.*,
747 F.3d 1193 (9th Cir. 2014)............................................................................................... 4

*Napa Valley Limoncello LLC v. Nationwide Agribusiness Ins. Co.*,
No. 24-CV-03243-HSG, 2025 WL 3771898 (N.D. Cal. Dec. 31, 2025)................................. 4

*In re PFA Ins. Mktg. Litig.*,
No. 4:18-CV-03771 YGR, 2022 WL 3146557 (N.D. Cal. June 15, 2022).............................. 4

*In re Baby Food Prods. Liab. Litig.*,
No. 24-MD-03101-JSC, 2026 WL 559857 (N.D. Cal. Feb. 27, 2026)......................... 3, 10, 11

**Rules**

Federal Rule of Evidence 702 ........................................................................................*passim*

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Primary and Excess Insurers retained Alan Eyre as an expert to "assess and summarize the state of U.S. relations" with Iran "as relevant to the seizure of the *Advantage Sweet* and subsequent confiscation of the Chevron-owned oil."[1] Declaration of Mikaela Whitman ("Whitman Decl.") ¶ 2, Ex. 1 Expert Report of Alan Eyre ("Eyre Report") at 12. The Court should exclude Mr. Eyre's testimony because his opinions will not assist the trier of fact in interpreting the terms of the contract provision at issue in this litigation. Relevance aside, Mr. Eyre is not qualified to offer several opinions that are plainly beyond the scope of his experience or that rest on faulty methodology.

As an initial matter, the viewpoint of a former State Department official on the state of U.S. relations vis-à-vis the Islamic Republic of Iran is not relevant to the interpretation of the terms of Chevron's War Risks Policy. Thus, Mr. Eyre's views and policy preferences will not help the trier of fact apply straightforward contract terms. Nor is Mr. Eyre's worldview useful in characterizing the kinetic military actions carried out by one nation against another's interests. Military operations are military operations, irrespective of what provoked them. That is especially true when the facts about those military operations are on video and undisputed.

Even though everyone involved in this litigation has viewed the video of the Iran Navy's heliborne assault on and seizure at gunpoint of the Advantage Sweet, Mr. Eyre opines that the seizure was not a warlike or hostile action and not a military effort. Instead, Mr. Eyre opines, Iran's conduct was purely economic and consistent with a relationship between the United States and Iran that falls short of open warfare, *id.* at 15, despite the countries' "persistent mutual animosity," *id.* at 12. It should be plain that applying a policy veneer to recharacterize violent military conduct is not proper Rule 702 expert testimony.

Additionally, Mr. Eyre's expert report repeatedly and impermissibly strays far beyond the limited scope of his expertise by offering detailed opinions on maritime security, maritime trade,

[1] The terms "Primary Insurers" and "Excess Insurers" have the same meaning as set forth in Chevron's concurrently filed Motion for Partial Summary Judgment.

shipping, and naval warfare. For example, the Eyre Report provides detailed analysis of the 1981–1988 "Tanker War" between Iran and Iraq, and catalogs dozens of maritime incidents involving vessel seizures, naval harassments, and commercial shipping concerns. These are subjects on which Mr. Eyre has no education, training, or professional experience.

At his deposition, Mr. Eyre made a series of admissions that confirm his complete lack of maritime experience. He conceded that he has taken "no specific courses dedicated primarily to naval warfare or maritime security," has had "no posting where [his] primary responsibility was maritime issues or naval warfare issues," and could not recall "specific blocks of instruction given to [him] that definitely included naval warfare or maritime security." Whitman Decl. ¶ 3, Ex. 2 ("Eyre Dep. Tr.") at 140:3-8; 117:21-118:2; 141:1-5.

The same is true with respect to Mr. Eyre's opinions regarding an alleged Iran court order related to the discharge of the cargo aboard the Advantage Sweet. Mr. Eyre offers opinions on the structure of the Iran judicial system, the "consistent[cy]" of certain Iran court orders with others, the purported "motivations" of the Iran judiciary, and the "legitimacy" of its actions. Eyre Report at 30. Mr. Eyre offers these opinions despite a glaring lack of legal education, training, or experience. *Id.* at 1-11 (CV and "Narrative Accompanying CV"). In short, Mr. Eyre is not an expert on these subjects.

Setting aside Mr. Eyre's lack of qualifications and the irrelevance of his opinions, the Court should exclude his opinions because they are unreliable, speculative, and lack foundation. Indeed, Mr. Eyre's testimony regarding the alleged Iran court order is based entirely on speculation. He has never seen the order, cannot confirm it exists, and made no meaningful effort to verify it. And a substantial portion of his report relies on Iran state-controlled news outlets. Mr. Eyre's professional background highlights the unreliability of these outlets, yet he articulates no methodology whatsoever for evaluating whether those sources are accurate or propagandistic. Accordingly, the Court should exclude Mr. Eyre's expert testimony on the state of U.S. relations vis-à-vis Iran, maritime security, maritime trade, shipping, and naval warfare, Iran law, the alleged Iran court order, and any opinions based on Iran state-controlled media pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993).

## II. LEGAL STANDARD

The admissibility of expert opinion is governed by Federal Rule of Evidence 702 and the Supreme Court's ruling in *Daubert.* Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Before a witness may offer an expert opinion, the court must determine whether the witness is an expert in the subject matter for which he is proffered, and whether his testimony is reliable and relevant. *Daubert*, 509 U.S. at 589-91; *In re Baby Food Prods. Liab. Litig.,* No. 24-MD-03101-JSC, 2026 WL 559857, at *2 (N.D. Cal. Feb. 27, 2026) (J. Corley) ("In sum, the trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'") (citation omitted).

Under *Daubert*, courts act as a "gatekeeper" and determine whether the expert testimony is relevant and reliable and whether it will assist the trier of fact. *Kumho Tire Co. LTD. v. Carmichael*, 526 U.S. 137, 138 (1999). "This 'gatekeeping' obligation applies not only to 'scientific' testimony, but to all expert testimony." *Id*. "[T]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 Advisory Committee's Notes.

## III. ARGUMENT

### A. Mr. Eyre's Opinions on U.S. Policy Vis-à-Vis Iran Would Not Help the Trier of Fact Determine a Fact in Issue.

Expert testimony is relevant only "if the knowledge underlying it has a valid connection to the pertinent inquiry." *Messick v. Novartis Pharms. Corp*., 747 F.3d 1193, 1197 (9th Cir. 2014); *see also In re PFA Ins. Mktg. Litig.*, No. 4:18-CV-03771 YGR, 2022 WL 3146557, at *4 (N.D. Cal. June 15, 2022) (to be relevant, expert testimony must "logically advance[ ] a material aspect of the proposing party's case."). Similarly, "relevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Napa Valley Limoncello LLC v. Nationwide Agribusiness Ins. Co.,* No. 24-CV-03243-HSG, 2025 WL 3771898, at *2 (N.D. Cal. Dec. 31, 2025).

Despite the breadth of Mr. Eyre's opinions, his testimony will not help the Court understand or determine any of the facts at issue. This case requires the Court to resolve whether Chevron's War Risks Policy covers the loss of Chevron's cargo caused by the Iran Navy's seizure of the *Advantage Sweet*. Ultimately, that question requires the Court to apply undisputed facts to contract language. Because the Iran Navy captured and seized the *Advantage Sweet* by a "taking at sea"—events that no party disputes—the answer is straightforward.

This case does not require the Court to wade into the vicissitudes of United States-Iran foreign policy, the history of "animosity" between the two countries, or how the United States Department of State—now or in previous administrations—characterized the conflict between the two nations. Because, put simply, the seizure was what it was, the Court does not need an expert's gloss when reading the War Risks Policy. The Court should therefore preclude Mr. Eyre from testifying at trial.

### B. Mr. Eyre Is Not Qualified to Opine on Maritime Security, Maritime Trade, Shipping, or Naval Warfare.

If the Court does not preclude from Mr. Eyre from testifying wholesale, it should still prevent him from offering certain opinions because he is not qualified to give them. Rule 702 mandates that a proffered expert witness be "qualified as an expert by knowledge, skill,

experience, training" and requires the knowledge to be "scientific, technical, or other[wise] specialized" for such testimony to be admissible. And although a person may be qualified as an expert in one area, he or she may be precluded from offering opinions beyond that expertise. *AGA & Titan Inc. v. United Specialty Ins. Co*., No. 2:20-CV-02698-MCS-AS, 2021 WL 4783636, at *3 (C.D. Cal. Oct. 12, 2021) (agreeing that "[t]he fact that the purported expert may be qualified in one field vaguely related to another does not mean that he is qualified in that other field.").

1. Mr. Eyre Lacks Expertise in Maritime Security or Naval Warfare.

Mr. Eyre admitted during his deposition that he lacks training or education in maritime security or naval warfare:

> I have had no specific courses dedicated primarily to naval warfare or maritime security.
>
> ***
>
> I had no posting where my primary responsibility was maritime issues or naval warfare issues. That's an accurate assessment.

Eyre Dep. Tr. at 140:9-13; 117:13-17.

An expert who concedes he has no training or professional experience in a subject area cannot offer reliable opinions on that subject. *Droplets, Inc. v. Yahoo! Inc*., No. 12-CV-03733-JST, 2021 WL 11701485, at *2 (N.D. Cal. Nov. 29, 2021) (precluding expert testimony on website loading speeds where witness testified he was not an expert in that field); *Banda v. Herc Rentals, Inc*., No. 18-CV-05329-JCS, 2020 WL 353461, at *9 (N.D. Cal. Jan. 21, 2020) (granting *Daubert* motion after expert acknowledged he did not have the requisite expertise).

2. Mr. Eyre Lacks the Requisite Knowledge, Skill, Experience, and Training to be an Expert on Maritime Security, Maritime Trade, Shipping, or Naval Warfare.

The threshold question under *Daubert* and Rule 702 is whether Mr. Eyre is "qualified as an expert by knowledge, skill, experience, training" in maritime security, maritime trade, shipping, or naval warfare. He is not.

First, Mr. Eyre has no education or training in maritime security, maritime trade, shipping, or naval warfare. Eyre Report at 4. His CV does not list any training, coursework, or certifications in maritime subjects. *Id.* Second, Mr. Eyre's self-described areas of expertise do not include any maritime-related field. *Id.* His CV lists his areas of expertise as: "Policy Development, Strategic Communications, Analysis, Strategic Leadership, Security, Diplomatic Relations, Federal Government, Iran, U.S. Iran, Policy, Middle East, Energy, Proliferation, Climate Change, Sustainability and National Security." *Id.* None of these areas encompass maritime security, maritime trade, shipping, or naval warfare.

Third, Mr. Eyre's career history is exclusively in diplomacy, intelligence, and policy—not in maritime affairs. According to his CV, Mr. Eyre spent 40 years in federal service, the majority of which was as a civil servant in the U.S. government, a U.S. Department of State diplomat, and a government contractor. *Id.* at 6. At no point in his career has he served in any capacity involving maritime security, naval warfare, shipping, or maritime trade. *Id.* Nor does Mr. Eyre have any experience in the maritime industry.

In keeping with his lack of experience, Mr. Eyre was unable to demonstrate even a basic understanding of fundamental maritime concepts. He could not define a country's "contiguous zone," testifying that it and "territorial sea," were not "terms I have used regularly in the course of my work." Eyre Dep. Tr. at 145:19-146:5. He was unfamiliar with the "right of transit passage," stating:

> Q. And do you know, sir, of any circumstances in which the right -- the -- pardon me -- the right of transit passage can be suspended?
>
> A. That is not the -- excuse me. Let me start that sentence again. My expertise is on U.S.-Iran relations and on Iran.· My expertise is not on that specific question or the -- the – or that specific question.

*Id.* at 147:2-11. When asked under what circumstances the freedom of navigation can be impeded, he admitted: "No, I'm not an expert on that." *Id.* at 148:7. He had never heard of the San Remo Manual or the Newport Manual—two of the most widely recognized authorities on the law of naval warfare—testifying: "I cannot recall reading about either of those two manuals." *Id.*

at 154:20-22-155:2; 159:20-160:3. He was also unfamiliar with the maritime concept of "law of prize" and when asked about the term "flag state," Mr. Eyre requested that counsel define it for him. *Id*. at 160:4-7; 160:18-19.

Despite Mr. Eyre's complete absence of maritime "knowledge, skill, experience, training," his report is replete with opinions on maritime subjects that require specialized knowledge. His report provides a detailed analysis of statistics on "over 450 attacks" on merchant vessels and descriptions of the weapons used and casualties inflicted. Eyre Report at 14. He describes the IRGCN's "asymmetric doctrine" in the Persian Gulf, including its "guiding principles" of "surprise, deception, speed, flexibility and adaptability, decentralization, and highly mobile and maneuverable units." *Id*. at 17-18. And he catalogs dozens of maritime incidents involving vessel seizures, drone attacks on tankers, fast attack craft operations, and helicopter boardings. *Id*. at 32-40.

The law is clear that expertise in one field does not qualify a witness to opine in another. *Titan ADA*, 2021 WL 4783636, at *3 ("[t]he fact that the purported expert may be qualified in one field vaguely related does not mean that he is qualified in that other field."). Mr. Eyre's purported expertise in U.S.-Iran relations does not qualify him to render opinions on maritime matters.

Thus, the Court should preclude Mr. Eyre from providing opinions on:

1. Maritime security, including the nature, strategic purpose, or characterization of Iran's maritime actions;
2. Maritime trade;
3. Shipping; and
4. Naval warfare, including the structure or conduct of the Iranian Navy and the nature, history, pattern, or strategic significance of maritime seizures, attacks, or harassments by Iran.

**C. The Court Should Preclude Mr. Eyre From Testifying About the Existence, Validity, Legitimacy, or Legal Effect of an Alleged Iran Court Order**

1. <u>Mr. Eyre Is Not Qualified to Give Expert Opinions on Iran Legal Matters.</u>

Just as Mr. Eyre lacks the "knowledge, skill, experience, training" required to provide expert testimony maritime matters, he lacks any "knowledge, skill, experience, training" regarding Iran courts, their process, or their rulings. Fed. R. Evid. 702. In his report, Mr. Eyre opines on the structure of the Iran judicial system, the "consistent[cy]" of certain Iran court orders with others, *id.*, the purported "motivations" of the Iran judiciary, and the "legitimacy" of its actions. Eyre Report at 30.

Mr. Eyre did not attend law school in the United States or Iran. He never practiced law in the United States or Iran. And he does not purport to have any other legal "skill" or "training" within the meaning of Rule 702. *Id.* at 1-11 (CV and "Narrative Accompanying CV"). At no point in his report or his deposition did Mr. Eyre even attempt to explain his qualifications to serve as an expert witness regarding the existence, validity, legitimacy, or legal effect of the alleged Iran court order. Indeed, Mr. Eyre's opinions on such Iran legal matters—which in any event would not be helpful to the trier of fact on the matters at issue in this case—are no better than the Court's own ability to read orders from Iran's courts.

2. <u>Mr. Eyre's Testimony Regarding the Alleged Iran Court Order Should Be Excluded Because It Is Based on Speculation.</u>

Additionally, Mr. Eyre's opinions regarding the alleged Iran court order should be excluded in their entirety because they are based on pure speculation. Mr. Eyre admitted at his deposition that he has never seen the alleged court order, does not know if it even exists, and made no meaningful effort to verify it. His testimony on this subject therefore lacks the foundation and reliability required under Rule 702 and *Daubert*.

When asked directly whether he had seen any Iran court order regarding the *Advantage Sweet*, Mr. Eyre testified:

> To the best of my knowledge, I have not seen the order by the international branch of the Tehran court. That was putatively issued

> to confiscate the cargo of the *Advantage Sweet* after it was seized. I have seen press reportings of it. I have not seen that actual document.

Eyre Dep. Tr. at 43:5-15.

Critically, Mr. Eyre conceded that he could not even confirm whether such an order exists. When pressed on whether he could state with certainty that the order exists, he testified:

> If you're asking me if I could know with 100 percent certitude whether such an order exists, then I would respond that even were I to see the text of that order on Iranian media or on U.S. media, I could not be 100 percent sure. So I cannot give you — my expertise does not include giving you an expert opinion on whether that order exists.

*Id*. at 46:11-22.

Moreover, Mr. Eyre took no steps beyond reviewing press reports to verify the existence of the order. He testified that he "tried to find it online" and "could not," and that his sole sources of information were Western and Iranian press accounts. *Id*. at 44:22-45:2; 46:1-4. When asked whether he used his contacts in the Iran government to locate the order, he responded: "I would not have considered contacting members of the Iranian government to try to get a court order." *Id*. at 43:7-14.

Despite these concessions, Mr. Eyre's report characterizes the alleged Iran court order as a "legitimate judicial action[] by an Iranian court" and opines that the confiscation was "consistent with its other rulings." Eyre Report at 30. An individual who has never seen the document he opines about, who cannot confirm its existence, and who admits that his "expertise does not include giving you an expert opinion on whether that order exists," Eyre Dep. Tr. at 46:20-22, is in no position to render opinions about its legitimacy, legal effect, or consistency with other rulings. Such unqualified opinions do not pass muster under Rule 702 and would not be helpful to the trier of fact. Fed. R. Evid. 702 Advisory Committee's Notes; *see also In re Baby Food Prods. Liab. Litig.*, 2026 WL 559857, at *2**.**

Rule 702 requires that expert testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods." Fed. R. Evid. 702(b)-(c). This Court has

emphasized that expert opinions must be "properly grounded, well-reasoned, and not speculative before [they] can be admitted." Fed. R. Evid. 702 Advisory Committee's Notes; *see also In re Baby Food Prods. Liab. Litig.*, 2026 WL 559857, at *2. Mr. Eyre's opinions about the alleged court order fail to meet this standard. He has no firsthand knowledge of the order, no copy of it, no independent verification of its existence, and his testimony confirms that he is speculating. Accordingly, the Court should exclude any testimony by Mr. Eyre regarding the existence, validity, legitimacy, or legal effect of the alleged Iran court order.

**D. Mr. Eyre's Opinions on Iranian State-Controlled News Outlets Should Be Excluded as Unreliable and Speculative.**

A significant portion of the Eyre Report relies on Iranian state-controlled news outlets. The Eyre Report includes an appendix of over twenty translated Iranian press articles from outlets such as IRNA (the Islamic Republic News Agency), ISNA (the Iranian Students News Agency), TASNIM, and MIZAN. Eyre Report at 40-77. The Eyre Report itself acknowledges that "[a]ll Iranian news media is state-controlled in some fashion" and that "[t]here are definite redlines in what Iranian media will report." *Id*. at 18. Yet Mr. Eyre relies heavily on these very outlets to support his opinions about the seizure and confiscation, including the alleged basis for the Iranian court order and Iran's purported justifications for its actions.

These opinions are neither grounded in a reliable foundation nor the product of any discernible methodology, and they should be excluded under Rule 702 and *Daubert*.

First, Mr. Eyre's reliance on Iranian state-controlled media does not constitute a "reliable foundation" under Rule 702. Mr. Eyre's failure to distinguish reliable reporting from Iran government propaganda is particularly problematic given his unique professional background. Mr. Eyre's most recent paid position before serving as an expert witness in this case was as a contractor for the State Department's Global Engagement Center ("GEC"), where he was hired specifically to recognize, understand, expose, and counter Iran state disinformation. Eyre Report at 11. Mr. Eyre confirmed at his deposition that he

> was hired to track and, when appropriate, try to counter Iranian misinformation and disinformation" and that the GEC's mission involved assessing "whether or not state Iranian statements through

> the media or otherwise was disinformation or what's more generally referred to as propaganda.

Eyre Dep. Tr. at 67:13-18; 66:21-67:10. In other words, Mr. Eyre's employer recognized the pervasive nature of Iran propaganda efforts, and Mr. Eyre was paid to combat those efforts.

Mr. Eyre has also posted on social media that "Iran's Islamic Propaganda Organization's budget is bigger than that of its Department for the Environment," noting that the budget was equivalent to $120 million. Eyre Dep. Tr. at 72:18-73:4; Whitman Decl. ¶ 4, Ex. 3 (Eyre X post re Propaganda). He also posted that the Islamic Republic "repress[es] the truth." *Id.* at 76:14-21; *id.* ¶ 5, Ex. 3 (Eyre X post re Truth Repression). An expert who acknowledges that the Iranian government spends $120 million annually on propaganda and engages in pervasive efforts to "repress the truth" cannot then credibly rely on that same government's state-controlled news outlets as a reliable foundation for his expert opinions without, at a minimum, providing a rigorous and transparent methodology for evaluating the reliability of each source.

Yet in this case, Mr. Eyre uncritically accepts and relies upon reporting from the very same Iran state-controlled media apparatus that he was previously paid to expose as unreliable. He provides no explanation for this inconsistency, and no methodology for how he determined that the Iranian press reports he cites in his expert report are factual rather than propaganda. That is because there is no methodology.

Nonetheless, Mr. Eyre attempted to justify his reliance by claiming that "collectively, by looking at the Iranian media every day, one got a relatively good sense of the dynamics." *Id.* at 116:8-12. But this vague assertion that reading unreliable sources in the aggregate somehow produces reliable conclusions is precisely the kind of unsupported methodology that Rule 702 and *Daubert* are designed to exclude. *See In re Baby Food Prods. Liab. Litig.*, 2026 WL 559857, at *12 (excluding expert opinions not based upon a reliable method); *Int'l Swimming League, Ltd. v. World Aquatics*, 2025 WL 3257200, at *9 (N.D. Cal. Nov. 21, 2025) (J. Corley) (excluding expert who relied on industry expertise but failed to provide any methodology).

Second, Mr. Eyre provided zero basis or explanation for any methodology he used to determine which, if any, of the Iranian news reports were reliable. He identified no criteria, no

cross-referencing protocol, no corroboration process, and no analytical framework for evaluating the truthfulness of reporting from outlets that he concedes are state-controlled and individually unreliable. He did not explain how he determined which Iranian press accounts to credit and which to discount, or how he distinguished factual reporting from Iran government propaganda in those sources. This Court has made clear that expert opinions must be grounded in a discernible, reliable method. *See Int'l Swimming League*, 2025 WL 3257200, at *9 (granting motion to exclude where the expert relied on his industry expertise but failed to provide the actual methodology utilized to reach his conclusions). Mr. Eyre's approach of reading Iran state media and drawing conclusions without any stated methodology falls far short of this standard.

Accordingly, Mr. Eyre's opinions that are based on or derived from Iranian state-controlled news outlets should be excluded under Rule 702 and *Daubert* because (1) they are not based on a "reliable foundation" and (2) Mr. Eyre has provided no basis, explanation, or methodology for determining which, if any, of the Iranian government's press reports are reliable.

## IV. CONCLUSION

For the foregoing reasons, Chevron respectfully requests that the Court enter an Order excluding the testimony of Mr. Eyre in its entirety because it will not help the trier of fact resolve any facts in issue. Alternatively, because Mr. Eyre is unqualified and relies on faulty methodology, Chevron asks the Court to prevent Mr. Eyre from testifying about:

1. Maritime security, including the nature, strategic purpose, or characterization of Iran's maritime actions;
2. Maritime trade;
3. Shipping;
4. Naval warfare, including the structure or conduct of the Iranian Navy and the nature, history, pattern, or strategic significance of maritime seizures, attacks, or harassments by Iran;
5. The existence, validity, legitimacy, or legal effect of the alleged Iran court order; and
6. Facts based on or derived from Iranian state-controlled news outlets.

Dated: April 20, 2026

**MCGUIREWOODS LLP**

By: /s/ *Mikaela Whitman*
Mikaela Whitman

Anthony P. Tatum (appearance pro hac vice)
1075 Peachtree St. NE, 35th Floor
Atlanta, GA 30309
Phone: 404-443-5500
Fax: 404-443-5599
ttatum@mcguirewoods.com

Michael S. Gehrt (SBN 246450)
Mikaela Whitman (SBN 338622)
Kelsey D. Haines (SBN 327536)
1800 Century Park East, 8th Floor
Los Angeles, CA 90067-1501
Phone: 310-315-8200
Fax: 310-315-8210
mgehrt@mcguirewoods.com
mwhitman@mcguirewoods.com
khaines@mcguirewoods.com

Jenny Yi (SBN 314540)
201 Clay St., Suite 1300
San Francisco, CA 94111
Phone: 415-844-9944
Fax: 415-844-9922
jyi@mcguirewoods.com

Dylan M. Bensinger (SBN 318107)
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Phone: 704-343-2000
Fax: 704-343-2300
dbensinger@mcguirewoods.com

*Attorneys for Defendants and Counterclaim Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026 2026 I caused the foregoing document entitled **MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF ALAN EYRE** to be electronically filed with the Clerk of the Court for the United States District Court, Northern District of California using the CM/ECF system and served a copy of same upon all counsel of record via the Court's electronic filing system.

Dated: April 20, 2026

By: *_/s/ Mikaela Whitman_*
Mikaela Whitman